202 N.J. Super. 416 (1985)
495 A.2d 422
STATE OF NEW JERSEY, PLAINTIFF-APPELLANT,
v.
JOHN ELBERT BATES, DEFENDANT-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued April 23, 1985.
Decided May 17, 1985.
*418 Before Judges MICHELS, PETRELLA and BAIME.
Thomas K. Isenhour, Assistant Prosecutor, argued the cause for appellant (John H. Stamler, Union County Prosecutor, attorney; Thomas K. Isenhour, of counsel and on the letter brief).
Donald A. DiGioia argued the cause for respondent.
The opinion of the court was delivered by MICHELS, P.J.A.D.
Pursuant to leave granted by this court, the State appeals from an order of the Law Division which granted the motion of defendant John Elbert Bates to suppress evidence seized following his arrest.
Defendant was indicted by the Union County Grand Jury and charged with burglary in violation of N.J.S.A. 2C:18-2 and theft of movable property having a value in excess of $200 in violation of N.J.S.A. 2C:20-3. Following his arraignment and entry of a plea of not guilty to the charges, defendant moved to *419 suppress the evidence. The trial court held at the conclusion of the lengthy hearing that there was no probable cause to arrest defendant and, alternatively, if assuming that defendant was not arrested and there was a legitimate investigatory stop, there was no legal right for the police to ask defendant to raise his foot and display the soles of his shoes. The trial court thereupon suppressed all evidence seized as a result of the arrest. The State challenges the ruling contending, among other things, that there was probable cause to arrest defendant prior to the visual inspection of the soles of his shoes and that there clearly was probable cause to arrest after the inspection. We agree and reverse.
The facts are these: At approximately 4:45 p.m. on March 19, 1984, Officers Nolan and Ross of the Rahway Police Department received a report of a theft of a television set from 39 West Scott Avenue, Rahway. A later radio transmission described the robbery suspects as two black males driving a small brown vehicle which had fled west on West Scott Avenue. The report said that one of the suspects was wearing a dark blue or black jacket and that the suspects' vehicle had a temporary registration sticker in its rear window. Officer Nolan went directly to the scene of the alleged burglary, a metal fabrication business located in a commercial and industrial neighborhood in Rahway. As he drove up he observed the television set which the victims had reported as stolen sitting on the lawn in front of the victims' premises. The business itself was set back approximately fifteen feet from the street, including a lawn area approximately ten feet wide and a sidewalk and curb area about five feet wide. Upon arriving at the scene Officer Nolan did not observe any pedestrian traffic in the area or other persons present on the street.
One of the victims, Peter Holler, Sr., told Officer Nolan that he had initially observed defendant and his confederate in their vehicle parked in the no parking zone directly in front of 39 West Scott Avenue. Defendant had exited from the car and had started walking towards the front door. He then "abruptly *420 turned around and got back into the vehicle." Peter Holler, Sr., after seeing defendant, "looked around and noticed that there was a door that was shut to the office area which is usually left open." Also noting that his dog was absent, he called his sons, Daniel and Peter, and told them "something's wrong" and expressed concern about the "black guy out in front." Daniel walked to the front of the building where he "sees this guy stepping out of the vehicle, then stopping and getting right back into the vehicle without ... being on the sidewalk ... but stepping out of the car and then stepping back inside." Daniel then looked upstairs, where the apartment in which he lived was located, and saw that his apartment door was wide open. He ran up the stairs and, looking inside, found that his television set was missing. He yelled down to his father, who was already on the telephone with the police, and reported the theft. Daniel also observed the suspects' vehicle leave the scene and proceed in a westerly direction down West Scott Avenue.
Officer Nolan testified that none of the victims or other employees of the shop had heard the dog barking just prior to the moment when Peter Holler, Sr., spotted defendant, and that the dog was later found elsewhere on the premises. In addition, the victims did not know that the television set was on the front lawn until Officer Nolan pointed it out.
In the course of investigating the theft, Officer Nolan spotted several sets of footprints in the area surrounding the television. Officer Nolan described the area as "fairly dry" and indicated that "there was no rain on that day." Four of the prints had a distinctive pattern, as Officer Nolan described:
It was like a ridge mark going across, then like a little curve coming down with a little circle on the edge. And this was the major characteristic to the shoes and to the prints that were at the scene.
Officer Nolan observed three of these distinctive footprints in the lawn area in front of the shop and spotted the fourth in the dirt area between the sidewalk and curb. The police officer at that time hypothesized that the prints probably matched the *421 shoes worn by one or both of the suspects. The prints followed a path leading from the curb to within four or five feet of the television set and then back to the curb. Other footprints spotted by Officer Nolan in the vicinity of the television matched the "normal flat soled-type shoes with no markings" worn by one of the Hollers. Either Daniel or Peter Holler, Sr., admitted to Officer Nolan that he had been walking in the area around the set before Nolan spotted the distinctive footprints.
Officer Nolan subsequently received a radio transmission that other police officers at a location only two blocks away, Koza's Bar, had detained two possible suspects. Officer Nolan, accompanied by Daniel, proceeded to the bar where Daniel positively identified defendant. The officers later transported defendant back to the shop, where Peter Holler, Sr., also identified defendant.
Defendant and his confederate had been detained at the bar after Officer Ross spotted them walking down West Scott Avenue about two blocks from the victims' shop while he was proceeding to the burglary scene. Officer Ross, believing these individuals fit the descriptions he had received on his radio, watched as they entered Koza's Bar and then called for back-up assistance. While Officer Ross was awaiting the arrival of the back-up police officers, two employees of the metal fabrication business who had chased the suspects down West Scott Avenue, Peter Holler, Jr., and Charles Brown, came up to Officer Ross and told him they had also seen the suspects enter the bar.
After the back-up policemen arrived Officer Ross entered the tavern with another police officer. One suspect was playing pinball, and the other was sitting at the bar. Officer Ross asked them how long they had been there and informed them of the incident at the metal fabrication business. The suspects responded that "they had been there for a while," but in reality less than five minutes had passed since Officer Ross had seen them enter the bar. Officer Ross also turned to one of the *422 other customers and said "Have they been in here long?" The customer responded, "No, they just came in." In response to questioning the suspects told Officer Ross that they were in the area looking for work and had arrived by bus.
Officer Ross requested that the suspects accompany him outside the bar, and they voluntarily complied. Officer Nolan then arrived with Daniel, who identified defendant as the person "he saw at the [shop] ... getting in and out of this vehicle." However, defendant denied having a car and claimed that he and his confederate had walked to the area. Officer Nolan then asked if he could see the soles of the suspects' shoes. One of the suspects "voluntarily lifted his foot up" for Officer Nolan's inspection. As Officer Nolan described:
The imprint of that foot, that shoe, matched what I saw at the scene. The basic design matched the design of the footprints at the scene, which was in the grass and dirt area.
To inspect the soles of the second suspect's shoes, Officer Nolan had to lift up the suspect's foot. The second suspect's shoes also matched the distinctive pattern he had spotted on the lawn of the metal fabricating business. Officer Nolan could not recall which suspect voluntarily complied with his request to inspect the shoes.
Officer Nolan then placed the suspects under arrest. A search of defendant incident to that arrest yielded a set of car keys which the police later found fit defendant's Ventura automobile. Officers searching the area later located defendant's Ventura, which matched the description given earlier by the Hollers' of the suspect's car, around the corner from Koza's Bar. After transporting defendant and his confederate to Police Headquarters, the police confiscated their shoes.
We are satisfied that, contrary to the trial court's conclusion, the officers had probable cause to arrest defendant for burglary and theft. "Probable cause" for an arrest exists where a police officer has a well-founded suspicion or belief of guilt. That suspicion or belief may constitute something less than the proof needed to convict and something more than a *423 raw, unsupported suspicion. State v. Davis, 50 N.J. 16, 23-24 (1967), cert. den., 389 U.S. 1054, 88 S.Ct. 805, 19 L.Ed.2d 852 (1968); State v. Contursi, 44 N.J. 422, 429-430 (1965); State v. Burnett, 42 N.J. 377, 386 (1964). As Chief Justice Weintraub so aptly pointed out in State v. Davis, supra, "the rule of probable cause is `a practical, non-technical conception' designed to afford `the best compromise that has been found for accommodating ... often opposing interests' and that `[r]equiring more would unduly hamper law enforcement. To allow less would be to leave law-abiding citizens at the mercy of the officers' whim or caprice.'" Id. 50 N.J. at 24 (quoting Beck v. State of Ohio, 379 U.S. 89, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964)).
Moreover, probable cause need not equal the prima facie case required to sustain a conviction, State v. De Simone, 60 N.J. 319, 322 (1972), and need not be based solely on evidence admissible in a courtroom. State v. Fariello, 71 N.J. 552, 569 (1976). No more is demanded than a well-grounded suspicion or belief that (1) an offense is taking place or has taken place and (2) that the suspected individual is or was a party to it. See State v. De Simone, supra, 60 N.J. at 322. See also State v. Davis, supra, 50 N.J. at 23-24; State v. Burnett, supra, 42 N.J. at 386-388.
Applying these criteria to the totality of the facts known to the police when they arrested defendant, we are thoroughly convinced that the police had probable cause to make the arrest. We reach this conclusion without consideration of the evidence resulting from the comparison of the footprints at the scene of the burglary with the soles of defendant's shoes. At the time the police arrested defendant and his confederate the police had knowledge that at least four of the business' employees had spotted the suspects in the vicinity of the metal fabricating business simultaneously with their realization "that something [was] not right." An office door usually kept open was closed shut, and moments later Daniel discovered the theft of the television. At the time Daniel and Peter Holler, Sr., spotted the *424 suspects they were engaged in suspicious or at least peculiar conduct right in front of the premises. Peter Holler, Sr., saw defendant emerge from his car, which his confederate had parked in a no parking zone, take a couple of steps toward the building, and then abruptly turn around and walk back to the car. Daniel Holler saw defendant repeat these furtive movements a few moments later, after defendant's confederate moved the car forward several feet within the no parking zone. Defendant's conduct and its coincidence with the discovery of the burglary by the business' employees created a reasonable probability that defendant had "pulled up in the car to carry away the television set he had placed there, but because the witnesses were looking out the window he was forced to flee." Defendant and his confederate then left the scene in their car, and a few minutes later Officer Nolan arrived and spotted the television set on the metal fabrication business' lawn.
Daniel Holler later made a positive identification of defendant at Koza's Bar as the black male he had seen engaging in suspicious conduct in front of the shop. Officer Ross also testified that before he pursued the suspects into Koza's Bar he encountered two other employees of the metal fabrication business, Peter Holler, Jr., and Charles Brown. They confirmed Officer Ross' suspicion that the men he had seen go into the bar were the suspects in the alleged burglary.
The police also knew at the time of the arrest that defendant and his confederate had made false statements about their whereabouts during the afternoon and about the time they had spent in Koza's Bar. When Officer Ross asked them how long they had spent in Koza's Bar, the suspects responded "for a while." However, Officer Ross had seen the suspects enter the bar no more than ten minutes before he began questioning them. In addition, one of the patrons told Ross that the suspects "just came in." The suspects apparently also made false statements about the mode of transportation they had used to come to the area. Although the employees of the metal fabricating business had spotted defendant and his confederate *425 in a Ventura, the suspects told Officer Ross that they had come to the area by bus and had been looking for work. A few minutes later they changed their story, telling Officer Nolan that they had walked to the area.
We are convinced that, based solely on these statements, the police had reasonable grounds to believe the suspects were somehow involved in improper conduct or were withholding information. The police, armed with this knowledge, could reasonably place minimal credence in the suspects' explanation that they had come to that section of Rahway looking for work. Indeed, as the State points out, "job applicants usually don't abruptly leave when the prospective employer comes to the window."
Moreover, we have no hesitancy in concluding that in the totality of the circumstances the police were warranted in their judgment, even without the footprint evidence, that probable cause existed to arrest defendant and his confederate for burglary and theft. See State v. Fariello, supra, 71 N.J. at 569; State v. Davis, supra, 50 N.J. at 24-25; State v. Alexander, 191 N.J. Super. 573, 577-578 (App.Div. 1983), certif. den., 96 N.J. 267 (1984). It is evident "that the total knowledge of all the policemen" was "ample to persuade a reasonable mind that defendant should be deemed a suspect in terms of fair probabilities." See State v. Davis, supra, 50 N.J. at 25; State v. Fioravanti, 46 N.J. 109, 122 (1965), cert. den., 384 U.S. 919, 86 S.Ct. 1365, 16 L.Ed.2d 440 (1966).
Beyond this, even if we were to make the dubious assumption that there was not sufficient probable cause to arrest defendant before Officer Nolan compared the footprints at the scene of the burglary with defendant's and his confederate's shoes, the police officer's subsequent visual inspection of their shoes and the testimony of the officers on the footprint comparisons was highly probative and was further proof establishing probable cause for the police to arrest defendant.
*426 Contrary to defendant's assertions, visual inspection of the soles of defendant's shoes in no way violated defendant's Fourth Amendment rights. Consent is, of course, a fundamental exception to the Fourth Amendment bar concerning warrantless searches. See State v. Johnson, 68 N.J. 349 (1975). See also Schneckloth v. Bustamonte, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). Other courts have upheld visual inspections of a suspect's shoes where a suspect voluntarily consented to the inspection or seizure. See State v. Curry, 390 So.2d 506 (La. 1980); U.S. v. Hensley, 374 F.2d 341 (6th Cir.1967), cert. den., 388 U.S. 923, 87 S.Ct. 2139, 18 L.Ed.2d 1373 (1967), reh'g den., 389 U.S. 891, 88 S.Ct. 25, 19 L.Ed.2d 210 (1967).
Although Officer Nolan could not identify which suspect complied with his order to inspect the shoes and the trial court made no pertinent findings of fact with respect thereto, we are satisfied that Officer Nolan's visual examination of defendant's shoes did not violate defendant's Fourth Amendment rights. In our view, the visual inspection of defendant's shoes did not constitute a search and seizure subject to constitutional protection.
Our courts have defined the term "search" as "`an invasion, a quest with some sort of force, either actual or constructive.'" State v. Roman, 182 N.J. Super. 297, 299 (App. Div. 1982), certif. den., 89 N.J. 431 (1982) (quoting People v. Carroll, 12 Ill. App.3d 869, 299 N.E.2d 134 (App.Ct. 1973), cert. den., 417 U.S. 972, 94 S.Ct. 3180, 41 L.Ed.2d 1144 (1974)). "A search implies some exploratory investigation and prying into hidden places for that which is concealed." State v. Anglada, 144 N.J. Super. 358, 361 (App.Div. 1976). See State v. Griffin, 84 N.J. Super. 508, 517 (App.Div. 1964). The Supreme Court has emphasized that a "`search' occurs when an expectation of privacy that society is prepared to consider reasonable is infringed." U.S. v. Jacobsen, 466 U.S. 109, 104 S.Ct. 1652, 80 L.Ed.2d 85, 94 (1984). See also U.S. v. Dionisio, 410 U.S. 1, 8, *427 93 S.Ct. 764, 768, 35 L.Ed.2d 67 (1973); Terry v. Ohio, 392 U.S. 1, 9, 88 S.Ct. 1868, 1873, 20 L.Ed.2d 889 (1968). It of course follows that the Fourth Amendment "provides no protection for what `a person knowingly exposes to the public,'" such as one's own voice, handwriting or facial expressions. U.S. v. Dioniso, supra, 410 U.S. at 14, 93 S.Ct. 764, 771, 35 L.Ed.2d 67 (quoting Katz v. United States, 389 U.S. 347, 351, 88 S.Ct. 507, 511, 19 L.Ed.2d 576 (1967)). A "seizure" has been said to constitute "a forceable or secretive dispossession of something against the will of the possessor-owner, both terms [`search' and `seizure'] connoting hostility between the searcher and the person whose property or possessions are being searched or sought." State v. Roman, supra, 182 N.J. Super. at 299 (quoting People v. Carroll, supra).
At the time Officer Nolan visually inspected the soles of defendant's shoes, defendant was in a standing position, and the soles of defendant's shoes were therefore concealed from view. However, to examine the soles of defendant's shoes, Officer Nolan had only to minimally intrude on defendant's person, by lifting his leg. For the visual inspection to have constituted a "search," defendant must have had a reasonable expectation of privacy in the area searched. See Terry v. Ohio, supra, 392 U.S. at 9, 88 S.Ct. 1868, 1873, 20 L.Ed.2d 889; Katz v. United States, supra, 389 U.S. 347, 361, 88 S.Ct. 507, 516, 19 L.Ed.2d 576 (Mr. Justice Harlan, concurring). We are convinced that defendant's expectation of privacy in the soles of his shoes was minimal. Cf. State v. Bruzzese, 94 N.J. 210, 238 (1983); State v. Mark, 46 N.J. 262, 269-270 (1966). The soles of a person's shoes, and especially the pattern on the soles of a person's shoes, are constantly exposed for public view, such as when we kneel to pray, when we lift our feet to walk or run, when we cross our legs or prop them up on a table or chair, when we remove our shoes and leave them lying idly on the floor, or as in this case, when we leave footprints in the mud or dirt. Cf. United States v. Dionisio, supra.
*428 Furthermore, the lifting of defendant's leg and the inspection of his shoes did not constitute a "seizure." The police did not actually seize any evidence during or as a result of the inspection, and defendant was not dispossessed or deprived of any property. The police also did not further deprive defendant of his liberty, since the defendant had already been detained for investigatory questioning. See State v. Alexander, supra, 191 N.J. Super. at 576-577. In our view, the trial court erred in suppressing the evidence seized following defendant's arrest.
Accordingly, the order of suppression under review is reversed and the matter is remanded to the trial court for further proceedings. We do not retain jurisdiction.