**UNITED STATES of America, Appellee,**

v.

**Francis FERRI, Appellant in Nos. 84–3670 and 84–3671, John Regis King, Appellant in No. 84–3615, Ivan Marra, Appellant in No. 84–3653.**

**Nos. 84–3615, 84–3653, 84–3670 and 84–3671.**

United States Court of Appeals, Third Circuit.

Argued Sept. 9, 1985.

Submitted on Additional Briefing Nov. 4, 1985.

Decided Dec. 10, 1985.

Rehearings and Rehearings En Banc Denied Feb. 3, 1986 in Nos. 84–3653, 84–3670 and 84–3671.

George E. Schumacher, Federal Public Defender, James V. Wade (argued), Asst. Federal Public Defender, Pittsburgh, Pa., for appellant F. Ferri.

Edgar M. Snyder, Cynthia M. Danel (argued), Edgar M. Snyder & Associates, P.A., Pittsburgh, Pa., for appellant J. King.

Sally A. Frick (argued), Pittsburgh, Pa., for appellant I. Marra.

J. Alan Johnson, U.S. Atty., Paul J. Brysh (argued), Asst. U.S. Atty., Pittsburgh, Pa., for appellee.

Before SEITZ, BECKER and ROSENN, Circuit Judges.

## OPINION OF THE COURT

SEITZ, Circuit Judge.

Francis Ferri, John Regis King, and Ivan Marra appeal sentences imposed after their jury convictions for attempting to damage or destroy a building used in an activity affecting interstate commerce by means of an explosive, 18 U.S.C. § 844(i) (1982), and for conspiring to commit an offense against the United States, 18 U.S.C. § 371 (1982). This court has jurisdiction of their appeals under 28 U.S.C. § 1291 (1982).

## I.

At approximately midnight on June 10, 1982, a pedestrian stopped two Pittsburgh police officers and informed them that someone had broken a window in the door of the Buckaroo's Clothing Store ("Buckaroo's"). Upon their arrival at Buckaroo's, the officers noticed that the alarm system was turned off and that all of the broken glass was on the sidewalk outside the shop, indicating that it had been broken from within. The officers then entered the shop, but left immediately when they encountered a strong, sharp odor.

Further investigation by members of the Pittsburgh Fire Department uncovered an arson attempt gone awry. Investigators found fourteen five-gallon plastic containers throughout the store and its basement; all but one had been perforated and were leaking a liquid later identified as a highly flammable mixture of methanol and trichloroethane. They also found a hotplate wrapped in the sleeve of a shirt that had been soaked in the flammable liquid. This calculated effort to destroy Buckaroo's backfired, however, when the arsonists plugged the hotplate into a dead electrical socket.[1]

Among the other items found at the scene were two sets of clothing unlike the "Western-wear" sold at Buckaroo's. The first set, found underneath a desk in the rear of the store, included a pair of trousers, four socks, a T-shirt, and a pair of shoes. The second, found in a store dressing room, included a large (fifty-inch waist) pair of trousers and Jockey-style underwear, two socks, a tan cap, and a pair of shoes.

Pittsburgh fire officials then called the Bureau of Alcohol, Tobacco and Firearms ("BATF") into the investigation. A number of search warrants were issued during the course of the BATF investigation, several of which involved defendant King. One authorized the seizure of two pairs of shoes, two English touring caps, one pair of pants, and one pair of Jockey-style underwear with a fifty-inch waist from his residence. Another warrant authorized the seizure of hair and saliva exemplars from King, as well as inked footprints of his left and right feet.

BATF agents also executed two search warrants involving defendant Ferri, one of which authorized the seizure of two pairs of shoes, one pair of pants, and one T-shirt from his residence. In addition, the grand jury subpoenaed Ferri, compelling him to submit his feet and shoes for ink printing.

Eventually, the grand jury returned a two-count indictment naming Francis Ferri, John Regis King, and Ivan Marra as defendants. The first count charged them with conspiring to damage or destroy a building used in an activity affecting interstate commerce by means of an explosive in violation of 18 U.S.C. §§ 371 and 844(i) (1982); the second count charged them with attempting to damage or destroy a building used in an activity affecting interstate commerce by means of an explosive in violation of 18 U.S.C. §§ 2 and 844(i) (1982).

A trial was held in the district court, after which the jury returned a guilty verdict against all three defendants on both counts of the indictment. The district court then sentenced the defendants. King received consecutive prison terms of five years on both counts. Marra received consecutive prison terms of five years on the first count and ten years on the second count. Ferri, who was sentenced as a dangerous special offender pursuant to 18 U.S.C. § 3575 (1982), received consecutive terms of five years on the first count and twenty years on the second count; ten years of the latter sentence represents the section 3575 "enhancement." This appeal followed.

## II.

Defendants raise numerous objections to their convictions. We first address those

---

**1.** Investigators later tested the hotplate at a Pittsburgh fire station. When plugged into a *live* electrical socket, the hotplate ignited a shirt soaked in a liquid similar to that found at Buckaroo's in only 8.4 seconds.

based on alleged violations of the Federal Rules of Evidence and the Fourth, Fifth, and Sixth Amendments to the United States Constitution.

### A. *Evidentiary Issues*

#### 1. *The Expert Testimony of Dr. Louise Robbins*

At trial, the government introduced into evidence the expert testimony of Dr. Louise Robbins, a physical anthropologist and professor at the University of North Carolina, Greensboro. She compared the impressions inside the shoes found at Buckaroo's with those inside the shoes seized from King's and Ferri's residences, and with their inked footprints. On the basis of these comparisons, Dr. Robbins testified that the shoes found at Buckaroo's belonged to the two defendants.

King and Ferri assert that the district court erred when it admitted this testimony. The crux of their objection is that Dr. Robbins did not testify in conformity with a "generally accepted explanatory theory." *See, e.g., United States v. Brown,* 557 F.2d 541, 556 (6th Cir.1977); *Frye v. United States,* 293 Fed. 1013 (D.C.Cir.1923). We review "district court decisions to admit or exclude novel scientific evidence by an abuse of discretion standard." *United States v. Downing,* 753 F.2d 1224, 1240 (3d Cir.1985) (footnote omitted); *cf. Fuentes v. Reilly,* 590 F.2d 509, 511 (3d Cir.1979) (the district court has "broad discretion" to admit or exclude expert evidence and its actions should be sustained unless "manifestly erroneous").

This court first had occasion to consider the requirements to be placed upon the introduction of "novel" expert testimony in *Downing.* In that case, we expressly rejected the approach adopted in *Brown* and *Frye,* and held that "general acceptance" in the particular field to which a scientific technique belongs "should be rejected as an independent controlling standard of ad-

missibility." *Downing,* 753 F.2d at 1237. In other words, "a particular degree of acceptance of a scientific technique within the scientific community is neither a necessary nor a sufficient condition for admissibility." *Id.* Instead, we adopted a two-part test for determining the admissibility of such evidence: first, the district court must make a preliminary inquiry into "the soundness and reliability of the process or technique used to generate the evidence," *id.;* and second, it must balance "its assessment of the reliability of [the] novel scientific technique against the danger that the evidence, even though reliable, might nonetheless confuse or mislead the finder of fact," *id.* at 1240.

■ Unfortunately, we rendered our decision in *Downing* approximately six months after the trial in this case. As a result, the district court could not benefit from the analytical approach developed therein when determining whether to admit or exclude Dr. Robbins' testimony. After a review of the record, however, we find that the procedure employed by the district court was substantially consistent with that formulated in *Downing.*

#### a. *The Reliability of Dr. Robbins' Testimony*

Before permitting Dr. Robbins to testify, the district court held a lengthy hearing outside the presence of the jury on the admissibility of her testimony. This hearing inquired into a number of the factors we found relevant in *Downing* for determining the reliability of "novel" scientific evidence.[2]

First, the hearing inquired into Dr. Robbins' "qualifications and professional stature ... and the non-judicial uses to which the scientific technique are [sic] put." *Downing,* 753 F.2d at 1239. This included testimony concerning her educational background; her present and prior academic

---

2. The district court recognized that Dr. Robbins' exact methods with respect to footprint measurement and identification are not generally practiced in the scientific community, one factor that we noted as bearing on reliability in *Downing. See* 753 F.2d at 1238. This fact does not, however, conclude the inquiry; rather, "[t]he reliability inquiry that we envision is flexible and may turn on a number of considerations." *Id.*

appointments; her employment as a consultant in forensic science, including footprint identification; and her membership and participation in various professional organizations. It also included testimony about the uses to which similar footprint measurements have been put by the running shoe industry and the United States Armed Forces.

Second, the hearing inquired into "the 'novelty' of the new technique, that is, its relationship to more established modes of scientific analysis." *Downing*, 753 F.2d at 1238. Dr. Robbins made a detailed presentation before the district court, using charts, slides, and so forth, highlighting the manner in which she examines unknown footprints to determine if they were made by a particular individual. This presentation illustrated the specific measurements that she makes when examining a footprint, and it demonstrated that she has, where applicable, incorporated measurements employed by other scientists in prior investigations of feet and footprints. The presentation also highlighted the extent of Dr. Robbins' independent research with footprints, and the extent to which she has simply adapted the generally established measurement techniques of forensic or physical anthropology to the problem of footprint identification. *Cf. People v. Knights*, 166 Cal.App.3d 46, 212 Cal.Rptr. 307, 312 (1985) (holding that Dr. Robbins' "work ... is best characterized as an extension of well-established techniques traditionally used by physical anthropologists").

Finally, the hearing inquired into "expert testimony that has been offered in earlier cases to support or dispute the merits of a particular scientific procedure." *Downing*, 753 F.2d at 1239. In this regard, the district court heard testimony concerning Dr. Robbins' previous trial experience, as well as the prior trial experience of Dr. Claude Lovejoy, an expert called by the defense to dispute the reliability of Dr. Robbins' methodology. Dr. Lovejoy's testimony indicated that although he does not employ Dr. Robbins' precise methods for identifying footprints, he has on at least one prior occasion testified about footprint identification, employing a footprint exemplar to identify the defendant on the basis of a sockprint left at the scene of the crime.

We also take judicial notice of two reported opinions that have expressly approved of Dr. Robbins' testimony identifying the defendant involved on the basis of footprints left at the scene of the crime, *see Knights*, 212 Cal.Rptr. at 307; *State v. Bullard*, 312 N.C. 129, 322 S.E.2d 370 (1984), as well as one case like the present one in which she identified the defendant on the basis of inner sole impressions from shoes found at the scene of the crime, *see State v. Maccia*, 311 N.C. 222, 316 S.E.2d 241 (1984). In fact, in *Downing* we cited *Bullard* as an example of how to determine the reliability of "novel" scientific evidence by examining its relationship to and use of more established scientific techniques. *See* 753 F.2d at 1239.

In light of the analytical approach developed in *Downing*, we conclude that the district court committed no abuse of discretion when it determined that Dr. Robbins' testimony was sufficiently reliable to be admitted at trial. A thorough review of the record indicates that any objections to the "novelty" of her methods go not to admissibility, but to the weight to be accorded her opinion by the factfinder. *Cf. Bullard*, 322 S.E.2d at 384 (holding that testimony contradicting that of Dr. Robbins goes to the weight to be accorded her testimony by the jury, not to its admissibility).

b. *The Potential Prejudicial Impact of Dr. Robbins' Testimony*

■ The fact that the district court did not abuse its discretion when it found that Dr. Robbins' testimony was reliable does not, however, conclude our inquiry. Rather, "[a]fter assessing the reliability of the evidence, the [district] court must also weigh any danger that the evidence might confuse or mislead the jury." *Downing*, 753 F.2d at 1239. Under certain circumstances scientific evidence bearing "substantial indicia of reliability" may have to

be excluded, because of its tendency to confuse or mislead rather than assist the jury. *Id.* This result is most likely to occur in situations in which a technique "has 'assume[d] a posture of mythic infallibility,' *Addison v. United States,* 498 F.2d 741, 744 (D.C.Cir.1974), among lay persons, or at least one whose shortcomings are, for some reason, unlikely to be effectively communicated to the jury." *Downing,* 753 F.2d at 1239.

We find, however, that Dr. Robbins' testimony does not suffer from this shortcoming. We noted in *Downing* that "[t]he danger that scientific evidence will mislead the jury [may] be greater ... where the jury is not presented with the data on which the expert relies, but must instead accept the expert's assertions as to the accuracy of his conclusions." 753 F.2d at 1239. The district court in the present case focused on this precise distinction when it observed that:

> There are certain fields of science where a jury must accept a scientist's conclusion which the jury cannot observe itself and cannot understand itself. For example, a scientist can now do blood group matching and exclude parentage. The jury can't observe blood group sampling. The jury must accept the scientist's conclusion that this can be done....
>
> Now, on the other hand, there are certain experts [like Dr. Robbins] that testify before juries where it is not science at all. It is something that the jury can observe itself. It can understand itself, and the expert merely assists the jury because the expert says, "I have studied this particular observation for a number of years and my opinion is that I can make a match."

In other words, Dr. Robbins' methods of observation and measurement—as well as her ultimate conclusions—were susceptible to examination by the jury. The district court could properly have concluded that this fact significantly limited any potential prejudice that might arise from her testimony.

Two other factors noted in *Downing* also militate against a finding that Dr. Robbins' testimony was unduly prejudicial. First, the defendants all had ample notice of the evidence to be offered and an opportunity to conduct their own tests and produce their own experts. *See Downing,* 753 F.2d at 1241. In fact, they did produce one expert at the hearing on the admissibility of her testimony, and two experts at trial to contest the validity of Dr. Robbins' methods, as well as her ultimate conclusion that the shoes found at Buckaroo's belonged to defendants Ferri and King. Second, there is no indication in the record that any shortcomings in her methods were unlikely to be fully explored and communicated to the jury, either through crossexamination of Dr. Robbins or through the testimony of the experts called by the defendants.

We find, therefore, that the district court did not commit an abuse of discretion when it permitted Dr. Robbins to testify before the jury. Her testimony was sufficiently reliable to be admitted under the standard enunciated in *Downing;* and there is ample evidence in the record from which the district court could have concluded that any weaknesses in her testimony would be fully explored at trial, thus significantly limiting the potential prejudicial impact of her testimony. *See Downing,* 753 F.2d at 1241.

### 2. The Prior Exculpatory Statement of Defendant Marra

At trial, all three defendants sought to introduce into evidence part of a tape-recorded conversation between defendant Marra and a government informant; the district court, however, refused to admit the tape into evidence. Marra asserts on appeal that the exculpatory statement should have been admitted at trial under Fed.R.Evid. 804(b)(5), one of the two "residual" exceptions to the hearsay rule.[3] *See*

---

**3.** Ferri asserts that the statement should have been admitted under Fed.R.Evid. 801(d)(2), as an admission of a party-opponent. His reliance

on Rule 801(d)(2) is misplaced, however. To be admissible, a party's admission "must be contrary to that party's position at the time of the

*also* Fed.R.Evid. 803(24). To be admissible under Rule 804(b)(5), the proponent of such an out-of-court statement must demonstrate, *inter alia,* that it has "circumstantial guarantees of trustworthiness equivalent to the first four exceptions in Rule 804(b)." *United States v. Bailey,* 581 F.2d 341, 346 (3d Cir.1978); *Copperweld Steel Co. v. Demag-Mannesmann-Bohler,* 578 F.2d 953, 963–64 (3d Cir.1978); *cf. In re Japanese Elec. Prods. Antitrust Litig.,* 723 F.2d 238, 301–02 (3d Cir.1983) (holding that proponent's burden of demonstrating probativeness not fulfilled), *cert. granted,* — U.S. ——, 105 S.Ct. 1863, 85 L.Ed.2d 157 (1985). Where the district court has excluded such statements, our review is limited to the question whether it abused its discretion in determining that the statement failed to meet the requirements of Rule 804(b)(5). *Bailey,* 581 F.2d at 346.[4]

■ Marra argues that the circumstances under which the statement was *procured* provide the requisite "circumstantial guarantees of trustworthiness"—that is, "[t]he statement was obtained pursuant to the government's own arrangements for a tape recording, and the record is devoid of any indication that [Marra] knew he was being recorded." Marra's Brief at 28; *cf. Bailey,* 581 F.2d at 349 ("consideration should be given to factors bearing on the reliability of the reporting of the hearsay by the witness"). But an evaluation of the "trustworthiness" of an out-of-court statement must also focus upon "the circumstances in which [the declarant] made the statement and the incentive he had to speak truthfully or falsely." *Id.*

The circumstances surrounding the conversation at issue in the present case cast more than considerable doubt on Marra's incentive to speak truthfully about either the bombing of Buckaroo's or his previous conversation with two other government informants, in which he admitted making a bomb that did not go off from the same or a similar chemical mixture as that found at Buckaroo's. First, the conversation took place *after* the grand jury had subpoenaed Marra to testify. Second, the record indicates that the informant told Marra that the grand jury was investigating a bombing and that two government informants had implicated him in it—to which he replied, not unexpectedly, that he did not know anything about a bombing and that he had not told the two other informants anything about a bombing. We find, therefore, that given the circumstances in which the conversation took place, the district court committed no abuse of discretion when it excluded Marra's exculpatory statement.

### B. *Constitutional Issues*

#### 1. *The Challenge to Juror No. 3*

On the day after the jury had been empaneled, the defendants discovered that the husband of one juror was a fireman for the City of Pittsburgh. They immediately moved to examine her further; the district court denied their request. Later, however, an issue arose as to whether she knew Captain Hitchings, a Fire Department captain and government witness, who apparently knew the juror's husband. Fer-

---

trial." *Butler v. Southern Pacific Co.,* 431 F.2d 77, 80 (5th Cir.1970). In the instant case, Marra's statement was not contrary to his penal interest at the time of trial; rather, the statement was decidedly exculpatory in nature.

The basis upon which King would have admitted the tape at trial is unclear from the record; he has not, however, pressed this claim on appeal.

4. There is, admittedly, some confusion in this circuit as to the proper scope of appellate review under Rule 804(b)(5). In *Copperweld Steel Co.,* we stated that "[i]n reviewing the trial court's admission of this evidence [under Rule 804(b)(5) ] we are called upon to assess both a conclusion of law, that the [hearsay] was admissible, and findings of fact, trustworthiness, materiality, and the like. In review of the factual underpinnings for the admission of the evidence, we must decide if the findings of fact are clearly erroneous." 578 F.2d at 964. For the purpose of disposing of this case we need not, however, determine which is the appropriate standard of review. We find that Marra's statement was properly excluded as inherently untrustworthy, whether viewed as a question of law or as an inquiry into the district court's exercise of discretion.

ri and Marra immediately renewed their request for an additional *voir dire* examination of the juror. King, on the other hand, moved to disqualify her. The crux of his argument was that the district court should "imply" a bias to the juror based on the relationship between her husband and Hitchings, regardless of whether she was, in fact, personally acquainted with him. At this point, the district court conducted an additional *voir dire* examination of the juror,[5] after which none of the defendants challenged her for cause.

Ferri and King object to the district court's failure to remove the juror. King renews his argument that she should have been disqualified under the doctrine of "implied bias"; Ferri argues that, under the circumstances of this case, the district court's failure to remove her, *sua sponte*, constitutes plain error. We will address each objection in turn.

a. *Defendant King's Charge of Implied Bias*

■ Defendant King would have us find, as a matter of law, reversible error in the district court's failure to disqualify the juror under a doctrine of "implied bias." In approaching this issue, we must first determine whether, in light of the Supreme Court's opinion in *Smith v. Phillips*, 455 U.S. 209, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982), we are at liberty to reach such a result.

In *Phillips*, the defendant had been convicted of murder by a state-court jury. He brought a motion to vacate his conviction based on the fact that a juror had submitted—during the trial—an application for employment as a felony investigator in the District Attorney's Office. After a post-trial hearing, the trial court denied the motion to vacate, finding that the juror's application "'in no way reflected a premature conclusion as to the [defendant's] guilt, or prejudice against the [defendant], or an inability to consider the guilt or innocence of the [defendant] solely on the evidence.'" *Phillips*, 455 U.S. at 213–14, 102 S.Ct. at 944–45, *quoting People v. Phillips*, 87 Misc.2d 613, 627, 384 N.Y.S.2d 906, 915 (1975), *aff'd*, 52 A.D.2d 758, 384 N.Y.S.2d 715 (1976).

The defendant then brought a federal habeas proceeding, contending that he had been denied due process of law. Although the district court found insufficient evidence of *actual* bias, it granted the writ, "imput[ing] bias to [the juror] because 'the average man in [the juror's] position would believe that the verdict of the jury would directly affect the evaluation of his job application.'" *Phillips*, 455 U.S. at 214, 102 S.Ct. at 944, *quoting Phillips v. Smith*, 485 F.Supp. 1365, 1371–72 (S.D.N.Y.1980). The Second Circuit affirmed, although on alternative grounds. *See Phillips v. Smith*, 632 F.2d 1019, 1022–23 (2d Cir.1980) (holding that prosecutors' failure to disclose their knowledge denied defendant due process; to condone it would "ill serve to maintain public confidence in the judicial process").

In his argument before the Supreme Court, the defendant in *Phillips* relied primarily upon the district court's reasoning:

[Defendant] contends that a court cannot possibly ascertain the impartiality of a juror by relying solely upon the testimo-

---

5. The examination itself consisted of the following colloquy:

THE COURT: Hello, Mrs. Kirk. The attorneys were wondering and asked me to ask you if you were friendly with Mr. Hitchings that testified yesterday?

JUROR NO. 3: No, I'm not. I never heard the name until then.

THE COURT: Do you know whether your husband is a good friend of his?

JUROR NO. 3: No. Tom is a lieutenant with the squad over by Mercy Hospital, and I haven't discussed any of this with him. So I really—

THE COURT: So you don't really think he is?

JUROR NO. 3: I never heard the name before, and he never, you know, mentioned it.

THE COURT: I assume that the fact that your husband is a city fireman would not interfere with your ability to decide the case on the law and the evidence?

JUROR NO. 3: No, I refuse to let that influence me one way or the other.

THE COURT: Thank you very much.

ny of the juror in question. Given the human propensity for self-justification, [he] argues, the law must *impute* bias to jurors in Smith's position.

*Phillips*, 455 U.S. at 215, 102 S.Ct. at 944 (emphasis added). The Court disagreed. *Id.* It reversed the decision below, observing that:

> Due process means a jury capable and willing to decide the case solely on the evidence before it, and a trial judge ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen.

*Id.* at 217, 102 S.Ct. at 946. Thus, instead of implying bias to the juror involved, the Court "held that the remedy for allegations of juror partiality is a hearing in which the defendant has the opportunity to prove actual bias." *Phillips, Id.* at 215, 102 S.Ct. at 944; *see also id.* at 218, 102 S.Ct. at 946.

In the present case, the defendants requested and received an opportunity to demonstrate actual bias. The district court conducted an additional *voir dire* examination, after which not one of the defendants challenged the juror for cause. Arguably, that opportunity is all that they were entitled to after the Supreme Court's decision in *Phillips*.

We need not determine on this appeal, however, whether the Court's decision *Phillips* does or "does not foreclose the use of 'implied bias' in appropriate circumstances," *see Phillips*, 455 U.S. at 221, 102 S.Ct. at 948 (O'Connor, J., concurring). Even if we were inclined to find that it does not, we would not apply the doctrine in this case. In her concurring opinion in which she argued that the majority opinion does not foreclose use of the doctrine, Justice O'Connor noted that it applies only in those few "extreme situations" in which a hearing would be inadequate to uncover a juror's biases:

> Some examples might include a revelation that the juror is an actual employee of the prosecuting agency, that the juror is a close relative of one of the participants in the trial or the criminal transaction, or that the juror was a witness or

somehow involved in the criminal transaction.

*Id.* at 222, 102 S.Ct. at 948 (O'Connor, J., concurring).

In this case, on the other hand, we are not faced with a juror who was the victim of the same type of crime being tried. *See, e.g., United States ex rel. De Vita v. McCorkle*, 248 F.2d 1 (3d Cir.), *cert. denied*, 355 U.S. 873, 78 S.Ct. 121, 2 L.Ed.2d 77 (1957). Nor are we faced with a juror who is closely related to or associated with such a victim. *See, e.g., Jackson v. United States*, 395 F.2d 615 (D.C.Cir.1968). Instead, this case involves a juror who "has not been accused of misconduct or has no actual stake in the outcome of the trial, and thus has no significant incentive to shield [her] biases." *Phillips*, 455 U.S. at 223, 102 S.Ct. at 949 (O'Connor, J., concurring). In such a situation, "[i]t is fair to assume that the method [*voir dire*] that we have relied on since the beginning, *e.g., United States v. Burr*, [79 Fed. 1004], 25 F.Cas. No. 14,692g, p. 49, 51 (CCD Va.1807) (Marshall, C.J.), usually identifies bias." *Patton v. Yount*, 467 U.S. 1025, 104 S.Ct. 2885, 2892, 81 L.Ed.2d 847 (1984).

As a result, we reject King's assertion that under the circumstances here presented we must imply bias to the juror involved. Instead, we find that permitting the juror to remain did not subject the defendants to "manifestly unjust procedures resulting in a miscarriage of justice." *Phillips*, 455 U.S. at 222, 102 S.Ct. at 948 (O'Connor, J., concurring). As such, this decision substantially accords with the previous decisions of this court. *See Government of the Virgin Islands v. Gereau*, 502 F.2d 914, 934 (3d Cir.1974) (permitting divorced wife of non-crucial witness to remain on jury), *cert. denied*, 420 U.S. 909, 95 S.Ct. 829, 42 L.Ed.2d 839 (1975); *Government of the Virgin Islands v. Williams*, 476 F.2d 771, 773 (3d Cir.1973) (absent some evidence of actual partiality, a juror is not disqualified merely because he sat in a similar case arising out of a separate and distinct set of circumstances, even though the offenses charged are similar

and some of the same prosecution witnesses testify in each case).

b. *Defendant Ferri's Challenge for Cause*

Defendant Ferri would have us find that the district court's failure to remove the juror, *sua sponte*, constitutes plain error. Although the basis of his objection is not altogether clear, it can be interpreted in either of two ways. First, it can be read as an argument that the district court's failure to "imply bias" to her constitutes, under the circumstances, plain error. Alternatively, it can be read as an argument that the district court's failure to strike her for cause, *sua sponte*, constitutes plain error. Having already disposed of the issue of "implied bias," we will now briefly address the latter argument.

We begin with the observation that the question of the partiality of an individual juror "is plainly one of historical fact: did a juror swear that he could set aside any opinion he might hold and decide the case on the evidence, and should the juror's protestation of impartiality have been believed." *Patton v. Yount,* 104 S.Ct. at 2891 (1984). As a result, "the trial court's resolution of such questions is entitled, even on direct appeal, to 'special deference.'" *Id.* at 2892.

■ In this case, the district court conducted—at the defendants' request—an additional *voir dire* examination of the juror concerning the extent of her relationship with Hitchings and her ability to decide the case solely on the evidence and law presented at trial. *See supra* note 5. Although the inquiry was somewhat abbreviated in scope, the juror's answers were decidedly unequivocal. She stated that she did not know Hitchings, that she could decide the case solely on the law and the evidence before her, and that she would not let her husband's employment affect her decision.

We cannot, admittedly, assess the juror's credibility and the conviction with which she made these statements from the cold record before us. However, the district court did observe her demeanor and assess her credibility during the course of its *voir dire* examination. It is also noteworthy that none of the defendants challenged her for cause after the *voir dire* had been conducted. Under these circumstances, we defer to the judgment of the district court, because "under our system it is that judge who is best situated to determine competency to serve impartially." *Yount,* 104 S.Ct. at 2893. Thus, we decline Ferri's invitation to find plain error in the district court's failure to strike, *sua sponte,* the juror for cause.

2. *The Grand Jury Subpoena*

Defendant Ferri contends that the district court committed reversible error when it failed to quash a grand jury subpoena compelling him to submit his feet and shoes for ink printing. He argues that taking the prints constituted a "search" of his person in violation of the Fourth Amendment. He premises this argument on two assumptions: first, that he had a reasonable expectation of privacy in his feet and shoes, and second, that the government lacked probable cause to conduct the search. *Cf. United States v. Doe (Schwartz),* 457 F.2d 895, 897 (2d Cir.1972), *cert. denied,* 410 U.S. 941, 93 S.Ct. 1376, 35 L.Ed.2d 608 (1973). Our review of this issue is plenary.

We initially observe that "[a] 'search' occurs when an expectation of privacy that society is prepared to consider reasonable is infringed." *United States v. Jacobsen,* 466 U.S. 109, 104 S.Ct. 1652, 1656, 80 L.Ed.2d 85 (1984) (footnote omitted). In other words, to invoke the protection of the Fourth Amendment, a defendant must satisfy "a twofold requirement, first that a person have exhibited an actual (subjective) expectation of privacy and, second, that the expectation be one that society is prepared to recognize as 'reasonable.'" *Katz v. United States,* 389 U.S. 347, 361, 88 S.Ct. 507, 516, 19 L.Ed.2d 576 (1967) (Harlan, J., concurring). We must, therefore, determine whether the grand jury's request in this case "infringe[d] an expectation of privacy [on the part of Ferri] that society is

prepared to consider reasonable." *Jacobsen,* 104 S.Ct. at 1661. His *subjective* expectation of privacy in his feet and shoes, standing alone, is insufficient to trigger the protection of the Fourth Amendment.

■ Ferri and the government generally rely upon the same decisions both of this court and the Supreme Court, albeit they draw contrary conclusions from those decisions concerning the "reasonableness" of Ferri's expectation of privacy in his shoes and feet. We must determine, therefore, whether the production of one's feet and shoes for ink printing is more akin to the production of voice, handwriting, or hair exemplars, which fall outside the ambit of the Fourth Amendment, *see United States v. Dionisio,* 410 U.S. 1, 93 S.Ct. 764, 35 L.Ed.2d 67 (1973); *United States v. Mara,* 410 U.S. 19, 93 S.Ct. 774, 35 L.Ed.2d 99 (1973); *In re Grand Jury Proceedings (Mills),* 686 F.2d 135 (3d Cir.), *cert. denied,* 459 U.S. 1020, 103 S.Ct. 386, 74 L.Ed.2d 517 (1982), or to the production of blood samples and fingernail scrapings, which fall within the Fourth Amendment's requirement of reasonableness, *see Schmerber v. California,* 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966); *Cupp v. Murphy,* 412 U.S. 291, 93 S.Ct. 2000 (1973). Our review of these decisions, and their underlying rationale, indicates that it is more like the former than the latter—that is, the grand jury's directive that Ferri submit his feet and shoes for ink printing did not constitute a "search" of his person.

In *Dionisio* and *Mara,* the Supreme Court held that neither the summons to appear before the grand jury nor its directive to provide voice and handwriting exemplars "infringed upon any interest protected by the Fourth Amendment." *Dionisio,* 410 U.S. at 15, 93 S.Ct. at 772; *Mara,* 410 U.S. at 21, 93 S.Ct. at 775. The Court thus refused to require any preliminary showing of "reasonableness" by the government before the grand jury could compel a witness to produce the relevant physical evidence—a requirement even less onerous than a showing of probable cause, the standard advanced herein by Ferri.

*See In re September 1971 Grand Jury (Mara),* 454 F.2d 580, 584 & n. 5 (7th Cir. 1971); *see also In re Grand Jury Proceedings (Mills),* 686 F.2d at 138 (3d Cir.1982) (observing that "the Court of Appeals [in *Dionisio* and *Mara*] had held that the government must first make a showing of need for the exemplars which was 'reasonable' albeit not necessarily synonymous with probable cause"). The Court reasoned that voice and handwriting exemplars are not protected because "the Fourth Amendment provides no protection for what 'a person knowingly exposes to the public, even in his own home or office.'" *Dionisio,* 410 U.S. at 14, 93 S.Ct. at 771, *quoting Katz v. United States,* 389 U.S. at 351, 88 S.Ct. at 511.

The Court also observed that the compelled production of voice and handwriting exemplars is "immeasurably further removed from the Fourth Amendment protection than was the intrusion *into the body* effected by the blood extraction in *Schmerber."* *Dionisio,* 410 U.S. at 14, 93 S.Ct. at 771 (emphasis added); *cf. Cupp v. Murphy,* 412 U.S. at 295, 93 S.Ct. at 2003 (1973) (holding that, unlike fingerprints and voice or handwriting exemplars, the warrantless search of the defendant's fingernails went beyond mere physical characteristics constantly exposed to the public and constituted the type of intrusion upon personal security that is subject to constitutional scrutiny). Similarly, it noted that the production of such evidence "does not involve the 'severe, though brief, intrusion upon cherished personal security,' effected by the 'pat down' in *Terry*—'surely ... an annoying, frightening, and perhaps humiliating experience.'" *Dionisio,* 410 U.S. at 15, 93 S.Ct. at 772, *quoting Terry v. Ohio,* 392 U.S. 1, 24–25, 88 S.Ct. 1868, 1881–82, 20 L.Ed.2d 889 (1968).

Applying this rationale to the present case, it is apparent that Ferri has no *reasonable* expectation of privacy in the soles of his shoes, *accord State v. Coleman,* 122 Ariz. 130, 593 P.2d 684, 686 (Ct.App.1978), *aff'd in part, modified in part on other grounds,* 122 Ariz. 99, 593 P.2d 653 (1979);

*State v. Bruzzese,* 94 N.J. 210, 463 A.2d 320, 335 (1983); *State v. Bates,* 202 N.J.Super. 416, 495 A.2d 422, 428 (App.Div.1985); *State v. Selvidge,* 30 Wash.App. 406, 635 P.2d 736, 740 (1981), nor in his feet. Ours is a society in which the soles of one's shoes are on almost constant display to the public. *Cf. State v. Bates,* 495 A.2d at 428 ("The soles of a person's shoes ... are constantly exposed for public view, such as when we kneel to pray, when we lift our feet to walk or run, when we cross our legs or prop them up on a table or chair, when we remove our shoes and leave them lying idly on the floor, or as in this case, when we leave footprints in the mud or dirt."). Similarly, it is not unusual to expose one's feet to the public; whether lounging on the beach, swimming at a public or private pool, or simply relaxing with family and friends in confines of one's home, the public display of one's feet is not an infrequent occurrence. Nor does the forced production of one's feet and shoes involve the type of "humiliating experience" at issue in *Terry.* Rather, in terms of the intrusiveness of the search, it is more akin to "the fingerprinting in *Davis,* where ... we noted that the fingerprinting itself 'involves none of the probing into an individual's private life and thoughts that marks an interrogation or search.'" *Dionisio,* 410 U.S. at 15, 93 S.Ct. at 772, *quoting Davis v. Mississippi,* 394 U.S. 721, at 727, 89 S.Ct. 1394, at 1397, 22 L.Ed.2d 676 (1969).

Under these circumstances, Ferri's *subjective* expectation of privacy in his feet and shoes must yield to the admittedly legitimate investigatory power of the grand jury to determine whether a crime has been committed and who has committed it. *Dionisio,* 410 U.S. at 15, 93 S.Ct. at 772; *cf. In re Grand Jury Proceedings (Mills),* 686 F.2d at 145 (Gibbons, J., concurring) ("Any minimal residuum of fourth amendment exposure left unprotected by grand jury procedure must yield to the legitimate interest of the grand jury in the effective administration of criminal justice."). The compelled production of one's shoes and feet before the grand jury for ink printing does not constitute a "search" subject to the strictures of the Fourth Amendment. The government need only make "some preliminary showing ... that [the prints are] at least relevant to an investigation being conducted by the grand jury and properly within its jurisdiction, and are not sought primarily for another purpose" when it invokes the district court's powers to enforce obedience with such a subpoena. *In re Grand Jury Proceedings (Schofield),* 486 F.2d 85, 93 (3d Cir.1973); *see also id.* at 94 (Seitz, C.J., concurring).

### 3. *Defendant Marra's Brady Claim re: Zerron and Ashland Records*

At trial, the government sought to establish defendant Marra as the source of the methanol used in the attempt to destroy Buckaroo's. This strategy involved, in part, demonstrating that the Ashland Chemical Corporation delivered two fifty-five gallon barrels of methanol to Marra's research facility during 1982: the first in March or April, and the second on June 8, only two days before the attempted arson at Buckaroo's. To establish the first delivery, the government called Leonard Seaman, the president of Zerron, as a witness. He testified that Zerron paid Ashland $99.28 sometime in April of 1982, for methanol delivered to Marra's facility in March or April of that year. Seaman could only approximate the date, however, because Zerron had accidently misplaced several checks written between March 25 and April 22, 1982, including that allegedly written to Ashland.

Relying upon *Brady v. Maryland,* 373 U.S. 83, 93, 83 S.Ct. 1194, 1199, 10 L.Ed.2d 215 (1963), Marra contends that his conviction should be reversed, because the government suppressed Ashland and/or Zerron records that demonstrate that Ashland did not deliver a fifty-five gallon barrel of methanol to his research facility in March or April of 1982, contrary to the government's position in the district court. The central thrust of this argument involves the government's allegedly knowing failure to disclose to the court and jury

that Seaman's testimony in this respect, used by the government to convict him, was false. *See United States v. Bagley,* — U.S. —, 105 S.Ct. 3375, 3382, 87 L.Ed.2d 481 (1985); *United States v. Agurs,* 427 U.S. 97, 103–04, 96 S.Ct. 2392, 2397–98, 49 L.Ed.2d 342 (1976). To buttress this claim, Marra has supplemented the record before us with an affidavit from Seaman that, together with several exhibits (including a copy of the check, obtained from the payee bank), demonstrates that the check Seaman testified had been written to Ashland was, in fact, made payable to American Express for airline tickets. He has also produced a letter from Ashland, which states that Ashland did not make a credit sale to Zerron in March or April of 1982.

This specific *Brady* claim was not, however, addressed by the district court.[6] Although Marra did advance this claim in a post-trial motion for a new trial under Rule 33 of the Federal Rules of Criminal Procedure, he did so after filing the present appeal. As a result, the district court ruled that it lacked jurisdiction to reach the merits of the motion during the pendency of Marra's appeal before this court.

▉ After due consideration, we find it inappropriate to resolve this *Brady* claim in the first instance. *See DeMarco v. United States,* 415 U.S. 449, 450, 94 S.Ct. 1185, 1185, 39 L.Ed.2d 501 (1974) (per curiam); *United States v. Dansker,* 537 F.2d 40, 65 (3d Cir.1976), *cert. denied,* 429 U.S. 1038, 97 S.Ct. 732, 50 L.Ed.2d 748 (1977). Marra's allegations concerning what the government knew when it introduced Seaman's testimony regarding the April payment to Ashland, if true, are relevant to the establishment of cause for a new trial. *Brady* requires the government to disclose to the defendant evidence that is both exculpatory and material. *United States v. Starusko,* 729 F.2d 256, 260 (3d Cir.1984). Where the government has made knowing use of perjured testimony or, equivalently, failed to disclose that testimony used to convict the defendant was false, the suppressed evidence is material if there is any reasonable likelihood that the false evidence could have affected the jury's judgment. *Bagley,* 105 S.Ct. at 3382 & nn. 8–9; *United States v. Blasco,* 702 F.2d 1315, 1328 (11th Cir.), *cert. denied,* 464 U.S. 914, 104 S.Ct. 275, 78 L.Ed.2d 256 (1983). We, of course, cannot determine whether the government knew that Seaman's testimony was incorrect. Given the fact-bound nature of such an inquiry, the district court should decide in the first instance what the government knew and whether it violated its duties to Marra under *Brady. DeMarco,* 415 U.S. at 450, 94 S.Ct. at 1185. And our decision in this respect is without prejudice to any other action that Marra may wish to take in the district court; and, since we decline to pass on the question, we express no opinion on the merits of his *Brady* claim. *Dansker,* 537 F.2d at 65.

### III.

Accordingly, the judgments of sentence imposed on defendants Ferri and King will be affirmed. Defendant Marra's judgments of conviction under both counts of the indictment will be vacated and the cause remanded for further proceedings consistent with this opinion.[7]

---

6. In a pretrial motion, Marra had sought, *inter alia,* to compel disclosure of any grants of immunity, plea bargains, promises, preferential treatment, and any and all other exculpatory material in the government's possession. This motion was apparently denied on the government's representation that it had no exculpatory material, except for the plea agreements provided to the defendants with respect to the government informants called at trial.

7. In addition to those objections discussed in the body of this opinion, the defendants raise the following issues on appeal:

(1) Whether the district court erred in admitting testimony relating to the ratio of components in two fluid samples;

(2) Whether the district court erred in admitting Government Exhibit 100, the telephone toll chart, into evidence and later permitting it to go to the jury without a cautionary instruction;

(3) Whether the district court erred in excluding the testimony of Dr. Timothy Douglas White;

(4) Whether the district court erred in meeting with three jurors after the verdict and after the jury had been dismissed;

(5) Whether the district court erred in denying motions to suppress evidence filed by Ferri *pro se* and by his counsel, and whether it erred in denying King's motions to suppress evidence;

(6) Whether the district court erred in failing to dismiss the indictment because the United States relinquished *in personam* jurisdiction over Ferri;

(7) Whether Ferri, King, and Marra were denied a speedy trial pursuant to the provisions of 18 U.S.C. § 3161;

(8) Whether the district court erred in failing to dismiss the government's application to proceed under the enhanced sentencing statute with respect to Ferri;

(9) Whether the district court erred in denying King's and Marra's motions for severance;

(10) Whether the district court erred in admitting into evidence, through the testimony of two government informants, inculpatory statements of Marra and Ferri made after the end of the conspiracy charged;

(11) Whether the district court improperly invaded the province of the jury by summarizing the contentions of the parties;

(12) Whether the district court erred in refusing Marra's motion for a mistrial because of the allegedly improper cross-examination of a defense witness on extraneous matters;

(13) Whether the evidence was insufficient to convict Marra and Ferri;

(14) Whether the the instructions to the jury on aiding and abetting were adequate;

(15) Whether the district court misled the jury as to evidence of motive for the attempt to destroy Buckaroo's;

(16) Whether the district court indicated a personal opinion as to the defendants' guilt; and

(17) Whether Marra is entitled to a new trial because of an allegedly incorrect statement by a defense witness during cross-examination.

After reviewing the applicable portions of the record and defendants' legal arguments, we find these objections to be wholly without merit and dismiss them without further discussion.