Terry Bird was indicted for the capital murder of Charles Williams in violation of Ala. Code 1975, § 13A-5-40, subsection (a)(2) (murder during a robbery), (a)(4) (murder during a burglary, two counts), and (a)(14) (murder of a witness). His trial was consolidated with that of Jacob Warner. See Warner v.State, 594 So.2d 664 (Ala.Cr.App. 1990). Both defendants were convicted. The trial judge accepted the recommendation of the jury and sentenced Bird to life imprisonment without the possibility of parole. Bird presents nine issues on this appeal from his conviction. *Page 646 
 I
Although Bird is white, he alleges a violation of Batson v.Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). Bird claims standing to object to the alleged racial exclusion of blacks from the jury venire because co-defendant Warner is black and because Bird's wife is black, he frequently consorts with blacks, he lives in a relatively black neighborhood, and has many black relatives. Bird claims that through his associations and relationships he is, in fact, a member of the black community.
In order to establish a prima facie case of racial discrimination in the selection of a petit jury underBatson, "[t]he defendant must first prove that he is a member of a cognizable minority and that peremptory challenges were used to remove members of his race from the jury." Harrell v.State, 555 So.2d 263, 265 (Ala. 1989). Nonblack defendants cannot rely on Batson to challenge the prosecutor's use of peremptory challenges to exclude black venire members from the jury. United States v. Rodriquez-Cardenas, 866 F.2d 390, 392
(11th Cir. 1989); Bui v. State, 551 So.2d 1094, 1114
(Ala.Cr.App. 1988), affirmed, 551 So.2d 1125 (Ala. 1989); Smithv. State, 515 So.2d 149, 150 (Ala.Cr.App. 1987).
In United States v. Townsley, 843 F.2d 1070, 1083-84 (8th Cir. 1988), a majority of a panel of the Eighth Circuit Federal Court of Appeals held that two white defendants had standing to join in a black defendant's Batson challenge where all three defendants were tried together. On rehearing, the Court of Appeals, sitting en banc, reversed that holding and held that the two white defendants did not have standing and were not entitled to join in the black defendant's Batson challenge.United States v. Townsley, 856 F.2d 1189, 1190-91 (8th Cir. 1988). On this authority, we find that the trial judge properly concluded that Bird did not have standing to raise the Batson
objection. Moreover, in the companion case of Warner v. State, supra, this Court found that the prosecutor's use of peremptory challenges in this case did not violate the principles ofBatson and Ex parte Branch, 526 So.2d 609 (Ala. 1987).
 II
We find that the trial judge did not commit error in finding that defense witness Irving Miller was not qualified as an expert on the particular type of shoeprint evidence offered in this case. This issue involves the evidentiary requirements for the admission of expert testimony regarding novel techniques in shoeprint comparison and identification.
The State suspected that three individuals were involved in this offense: defendant Bird, co-defendant Jacob Warner, and Lee Lewis, who was not indicted. An investigator made photographs of bloody shoeprints at the scene of the crime. Later, the State seized shoes from each of the three suspects.
The State sent the photographs and the shoes to Dr. Barbara Louise Robbins, a physical anthropologist at the University of North Carolina, for examination and comparison. Dr. Robbins died before she could complete her examination. Apparently, her preliminary finding was that the shoeprints found at the scene of the crime were made by Lewis.
After learning of Dr. Robbins' unavailability, defense counsel arranged to have the photographs and shoes submitted to Dr. Irving Miller. Dr. Miller was a practicing podiatrist in Atlanta, Georgia. He stated that he had four days training by the F.B.I. in footprint identification and had had "an awful lot of training in footwear," apparently acquired in his practice of podiatry in examining and treating patients. Dr. Miller testified that he had been able to "develop [his] own system of identification, or develop a logical approach to identification. * * * Well, maybe not system is the correct word, but I have developed a feel for being able to identify footwear, shoewear, shoe patterns, wear patterns, et cetera."
Dr. Miller testified that there were textbooks in the area of footwear identification, but that none of them recognized his system. He recognized the State's expert, Dr. Lovejoy, as an expert in footwear identification. *Page 647 
Dr. Miller had taught at the F.B.I. academy on three occasions and had taught at Scotland Yard. He stated that his work was "basically" the same as that of Dr. Lovejoy and Dr. Robbins. He had not made any measurements of the feet of the three suspects, but maintained that "those accurate measurements of the foot are always reflected in the shoewear." He admitted that the acceptance of the theories of Dr. Robbins depended on "who you talked to." Dr. Miller had never testified or been qualified as an expert witness. He candidly admitted that although wear pattern analysis is recognized as an acceptable method of footprint examination, his "system" was not.
At one point Dr. Miller testified that he would not be able to testify "whether or not any of those people wore the shoe that made the print in the photograph." However, he also stated that, in his opinion, the "predominant wearers of the known shoes" were not the "predominant wearers of the unknown shoe." He could only testify to the wear pattern of the shoes he examined from Bird, Warner, and Lewis as compared to the wear pattern of the prints that were photographed at the scene of the crime. Dr. Miller stated that he examined the shoes allegedly worn by Bird, Warner, and Lewis and compared the wear marks on those shoes to the wear marks on the photographs of the shoeprints found at the scene of the crime. His conclusion was that the shoeprints found at the scene were not made by shoes normally worn by the three suspects.
The prosecution filed a motion in limine to suppress the testimony of Dr. Miller. In support of that motion, the State presented the testimony of Dr. Claude Owen Lovejoy, a professor of biological anthropology at Kent State University, Ohio. Dr. Lovejoy had examined the same shoes and photographs examined by Dr. Robbins and Dr. Miller.
Dr. Lovejoy stated that he had testified as an expert on footprints and shoeprints "at least seven times." He testified that Dr. Robbins' theories were not generally accepted in the scientific community. According to Dr. Lovejoy, the theory that Dr. Miller proposed to apply in this case, that is the taking of known shoes and the photograph of a shoeprint and determining whether or not the wearers of the known shoes wore the unknown shoe that made the print, was not a generally recognized and accepted principle in the scientific community: "To my knowledge, no one has proposed in the literature, or in a formal way, a technique by which one can take a print, a shoeprint, for which there's no known suspect shoe, and make significant conclusions about that, other than general characteristics as to its size."
Dr. Lovejoy testified at the suppression hearing that the evidence in this case was "just not sufficient" to exclude any of the three suspects from having worn the shoe that made the print. He stated that there was "no evidentiary value, in [his] opinion, as to any particular wear pattern in the evidence presented." He testified that an identification could not be made from the shoeprints without the known shoe and that he could "make an almost infinite number of hypothetical reasons why these prints appear as they do." He stated that he could not give any testimony on behalf of either the State or the defendant with any reasonable scientific certainty at all.
At the conclusion of the hearing on the admissibility of the testimony of Dr. Miller, the trial judge granted the State's motion in limine and suppressed Dr. Miller's testimony. The trial judge found that the issue in this case "borders between a scientific experiment . . . and . . . something in the nature of a physical comparison." The trial judge found that, under the test in Frye v. United States, 293 F. 1013 (D.C. Cir. 1923), Dr. Miller's testimony was not "deduced from a well-recognized scientific principle or theory" and his theory had not "gained general acceptance in the particular field in which it belongs."
In Alabama, the general rule is that any witness may testify to the correspondence between shoeprints or bare footprints and expert testimony is not required to make a comparison.Young v. State, 68 Ala. 569, 574-75 (1881). See also Cunningham *Page 648 v. State, 14 Ala. App. 1, 5-6, 69 So. 982, 984-85 (1915); Annot., 45 A.L.R.4th 1178 (1986); 43 Am.Jur.P.O.F.2d FootprintIdentification 217 (1985). However, a lay witness may not positively state that a particular shoe or foot made the shoeprint or the footprint.
 "The character of footprints, found where the crime is discovered, leading to or from the place of the crime, and their correspondence with the feet of the accused, or with shoes worn by him, or found in his possession, we have held, are admissible in evidence to identify him as the guilty agent. Young v. State, 68 Ala. 569. A witness may be allowed to state that he measured the tracks at the place where the crime was committed, and compared them with tracks made by defendant the next day, and they corresponded; but he will not be allowed to say that a particular shoe which he saw on defendant's foot would make such a track, nor that 'in his judgment it was defendant's track,' nor to give his opinion on the subject at all. He must state the facts of identification, and it is for the jury to find, from the facts deposed to, whether they were defendant's tracks or not. Busby v. State, 77 Ala. 66; Riley v. State, 88 Ala. 193, 7 South.Rep. 149. It was erroneous for the court to allow the evidence of witnesses to express their opinions 'that the tracks seen at or near the place of the killing were the same, and made by the same persons, as the others they occasionally saw elsewhere;' and for the sheriff to testify that the track or impression made by the shoe taken by him off of defendant's foot 'was the same as the other tracks, and made and seen several days previous, near the place of the killing and other places in the town of Brewton.' "
Hodge v. State, 97 Ala. 37, 39-40, 12 So. 164, 165 (1893), overruled on other grounds, Avery v. State, 124 Ala. 20,27 So. 505 (1900). See also White v. State, 12 Ala. App. 160, 163-64,68 So. 521, 522 (1915).
In this state, "[t]he opinions of experts on any question of science, skill, trade or like questions are always admissible, and such opinions may be given on the facts as proved by other witnesses." Ala. Code 1975, § 12-21-160. However, " 'expert opinion testimony should not be admitted unless it is clear that the jurors themselves are not capable, from want of experience or knowledge of the subject, to draw correct conclusions from the facts. The opinion of the expert is inadmissible upon matters of common knowledge.' C. Gamble,McElroy's Alabama Evidence § 127.01(5) (3d ed. 1977)." Wal-MartStores, Inc. v. White, 476 So.2d 614, 617 (Ala. 1985). "Where there are questions which inexperienced jurors are not likely to decide correctly, there is a necessity to admit opinion and conclusions of those specially skilled or experienced in the particular field; that is, experts who can give better opinions on a given state of facts." White v. State, 294 Ala. 265, 271,314 So.2d 857, 862, cert. denied, 423 U.S. 951, 96 S.Ct. 373,46 L.Ed.2d 288 (1975).
The general rule is that "[t]he criterion for admission of expert testimony is that the witness, by study, practice, experience, or observation as to the particular subject, should have acquired a knowledge beyond that of ordinary witnesses."White, 294 Ala. at 271, 314 So.2d at 862. However, in deciding the issue of the admissibility of Dr. Miller's testimony in this case, we must first determine whether Frye is applicable. If the principles of Frye do not apply, we must determine whether there was any proper ground for the suppression of Dr. Miller's testimony because "if the court's ruling was correct for any reason, it will not be reversed because the court assigned the wrong reason therefor." Harnage v. State, 290 Ala. 142,144, 274 So.2d 352, 354 (1972).
We recognize that "courts and commentators have divided over the issue of the foundational requirements for the admission of expert testimony regarding novel scientific techniques."State v. Prudden, 212 N.J. Super. 608, 515 A.2d 1260, 1265
(1986). See generally E. Cleary, McCormick On Evidence § 203 (3d ed. 1984). The case of Frye is often cited for *Page 649 
the proposition that "while courts will go a long way in admitting expert testimony deduced from a well-recognized scientific principle or discovery, the thing from which the deduction is made must be sufficiently established to have gained general acceptance in the particular field in which it belongs." Frye, 293 F. at 1014. In Alabama, Frye is not applicable where the test applied by the expert is "in the nature of a physical comparison rather than a scientific test or experiment." Ex parte Dolvin, 391 So.2d 677, 679 (Ala. 1980). In that case, the Alabama Supreme Court held that theFrye test of admissibility was not applicable to the identification of skeletal remains by a forensic odontologist through his comparison of the remains with inter vivos photographs of the victim. In Handley v. State, 515 So.2d 121,131 (Ala.Cr.App. 1987), this Court held that "the admissibility of the dental witness's bite mark comparison does not depend on meeting the Frye standard" because "[b]y looking directly at the physical evidence used, the models and the photographs, the jury was able to judge for itself whether or not appellant's teeth were similar to or did in fact match the bite marks found on the victim's body."
 "[T]he Frye test has been either ignored or rejected in cases in which the method used by the expert was a matter of physical comparison rather than scientific test or experiment; . . . the basic data upon which the expert relied was verifiable by the factfinder; . . . or where established techniques were applied to the solution of novel problems. . . . Many of these cases have involved identification of bite marks by comparison of the defendant's dental impressions to bite marks found on a victim's body; . . . and identification of footprints by comparing shoes found at the crime scene with shoes worn by the defendant; United States v. Ferri, 778 F.2d 985 (3d Cir. 1985), cert. denied, 476 U.S. 1172, 106 S.Ct. 2896, 90 L.Ed.2d 983 (1986); or by comparing footprints found at the crime scene with the defendant's feet. State v. Mark, 286 N.W.2d 396 (Iowa 1980); State v. Bullard, 312 N.C. 129, 322 S.E.2d 370 (1984). In such cases, the jury is in a position to weigh the probative value of the testimony without abandoning common sense and sacrificing independent judgment to the expert's assertions based on his special skill or knowledge. People v. Marx [54 Cal.App.3d 100, 126 Cal.Rptr. 350 (1975)]. Furthermore, where understanding of the method is accessible to the jury, and not dependent on familiarity with highly technical or obscure scientific theories, the expert's qualifications, and the logical bases of his opinions and conclusions can be effectively challenged by cross-examination and rebuttal evidence."
State v. Hasan, 205 Conn. 485, 534 A.2d 877, 880 (1987).
In Hasan, sneakers found in the defendant's residence were established as having made the footprints at the scene of the crime. A podiatrist was permitted to testify that the sneakers had been worn by and belonged to the defendant based upon his examination of the wear patterns on the inside and outside of the sneakers and of the defendant's feet. The Connecticut Supreme Court held that the admissibility of the expert's testimony did not depend on the general acceptance of his theories in the scientific community and was not subject to theFrye standard of admissibility.
 "The fact that there is no science of matching shoes to people or that Rinaldi [the podiatrist] was not qualified as an expert practitioner in that narrow field forms no barrier to the admissibility of his testimony. We consider this case one in which the established techniques in Rinaldi's uncontested area of expertise have been applied to the solution of a novel problem that is well within the capability of those techniques. See People v. Marx [54 Cal.App.3d 100, 126 Cal.Rptr. 350 (1975)]; State v. Temple [302 N.C. 1, 273 S.E.2d 273 (1981)].
 "We conclude that the admissibility of Rinaldi's testimony did not depend on general acceptance of his theories in the scientific community. His conclusions relied on no advanced technology, nor did he employ scientifically sophisticated methods, the understanding of which lies *Page 650 
beyond the intellectual powers of the ordinary layperson. The jury was not required to accept blindly the merit of his conclusions or methods. It had before it the same sneakers which had been examined by the podiatrist and, during the course of the trial, had seen the defendant try them on and walk in them. The value of Rinaldi's expertise lay in its assistance to the jury in viewing and evaluating the evidence. Cross-examination exposed the jury to the lack of literature pertaining to matching shoes to feet, and to the absence of studies or research in this area by Rinaldi or others. His credentials and methodology were before the jurors, who were competent to assess the reliability of the evidence and who could freely accept or reject his conclusions. See United States v. Williams [583 F.2d 1194, 1199-1200
(2d Cir. 1978), cert. denied, 439 U.S. 1117, 99 S.Ct. 1025, 59 L.Ed.2d 77 (1979)]. We hold, therefore, that the trial court did not abuse its discretion in admitting Rinaldi's testimony."
Hasan, 534 A.2d at 881 (footnote omitted).
In addition to Hasan, other courts have held that Frye does not govern the admissibility of footprint or shoeprint comparison by experts or have applied a standard of admissibility other than the general-acceptance-in-the-scientific-community standard ofFrye. United States v. Ferri, 778 F.2d 985, 989-90 (3d Cir. 1985), cert. denied, 476 U.S. 1172, 106 S.Ct. 2896,90 L.Ed.2d 983 (1986); Thiel v. State, 762 P.2d 478, 484-85 (Alaska App. 1988); People v. Knights, 166 Cal.App.3d 46, 212 Cal.Rptr. 307,311-12 (1985); State v. Bullard, 312 N.C. 129,322 S.E.2d 370, 380 (1984); People v. Daniels, 116 Cal.App.3d 797, 172 Cal.Rptr. 353, 360 (1981) (unofficial opinion); People v.Puluti, 120 Cal.App.3d 337, 357, 174 Cal.Rptr. 597, 603 (1981) (unofficial opinion); State v. Prudden, 212 N.J. Super. 608, 515 A.2d 1260, 1264-66 (1986).
We have examined a number of reported cases in which Dr. Robbins testified as an expert in shoeprint and footprint identification. See People v. Puluti, 174 Cal.Rptr. at 601-02 (compared a pair of shoes found at the scene of the crime with three pairs of shoes, one pair of thongs, and several inked footprint impressions obtained from the defendant); State v.Bullard, 322 S.E.2d at 373 (1984) (compared photographs of bare footprints at the scene of the crime with ink and latex paint impressions of the defendant's feet); State v. Maccia,311 N.C. 222, 316 S.E.2d 241, 243 (1984) (testified that the feet of the defendant made the imprints inside the shoes found at the scene of the crime; no issue raised concerning the admissibility of her testimony); People v. Knights, 212 Cal.Rptr. at 311-312
(compared bloody footprint found at the scene of the crime with the defendant's footprint exemplar). Indeed, in United Statesv. Ferri, 778 F.2d at 988. Dr. Robbins compared the impressions inside the shoes found at the scene of the crime with those inside the shoes seized from both defendants and with their inked footprints. She was permitted to testify despite the testimony of defense witness Dr. Lovejoy, who disputed the reliability of her methodology. Id. at 989.
In State v. Prudden, supra, the Court indicated, but did not hold, that Dr. Lovejoy's testimony concerning his morphological footprint comparisons was properly admitted. "Morphological footprint comparison involves the analysis of the form and structure of the foot. We use the term here to distinguish this technique from the more common procedure of identification of prints by way of comparison of dermatological ridges." Prudden,212 N.J. Super. at 615, 515 A.2d at 1264, n. 1. Prudden
involved the comparison of sockprints found at the scene of the crime with sockprints obtained from the defendant and others. In that case, the court stated:
 "We harbor no reservations concerning the witness' opinion that the footprints could not have been made by [the defendant's lover]. The State's evidence clearly established that the techniques employed by the witness were sufficiently reliable to permit an expert opinion excluding [the defendant's lover] on the basis of the prints taken at the scene as compared with the samples submitted. However, we question whether the State *Page 651 
presented sufficient evidence relating to the scientific reliability of the techniques employed to enable Dr. Lovejoy to reach the conclusion that there was a 'high probability' the footprints left in the bedroom and bathroom were those of defendant."
Prudden, 515 A.2d at 1265.
We have found no reported case in which Dr. Miller has testified as an expert.
The only case located in which the trial court was held to have erred in admitting the testimony of Dr. Robbins or a similar expert is People v. Ferguson, 172 Ill. App.3d 1, 122 Ill.Dec. 266, 526 N.E.2d 525 (1988). In terms of the type of comparison involved, Ferguson is almost identical with the case under review. There, Dr. Robbins testified that she compared plaster casts and photographs of shoe impressions at the scene of the crime with three pairs of shoes seized by the police from the residence of the defendant. The Illinois Appellate Court held that her expert testimony was not admissible because, under Frye, there was no evidence that her theory of comparison had gained general acceptance in the scientific community.
 "By her own testimony Robbins stands alone in the anthropological community regarding the belief that an identification can be made solely by measuring and analyzing the wear patterns on the soles of shoes. . . . Thus, Robbins' theory cannot be said to have gained general acceptance in the scientific community."
Ferguson, 122 Ill.Dec. at 272, 526 N.E.2d at 531 (emphasis in original). In Ferguson, the court also noted that even if a standard of admissibility less stringent than the Frye "general acceptance" test were applied (because Robbins' comparisons were subject only to a visual analysis), Robbins' testimony could not stand because
 "her theory is not only not generally accepted in her scientific community, but is also not shared with any other member of her field. More importantly, and perhaps obvious, there is no evidence that this method of identification 'is in such general and common use that the courts cannot refuse to take judicial cognizance of it.' "
Id. 122 Ill.Dec. at 273, 526 N.E.2d at 532 (emphasis in original).
Ferguson is significant not only because it is the only case located by this Court in which the trial court was reversed for the admission of Dr. Robbins' opinion testimony, but also because of the type of comparison conducted by the expert. The Illinois Appellate Court found significant the type of comparison involved.
 "Unlike the Illinois cases cited above [involving identification by comparison of shoe prints to the shoes suspected of making those prints], the instant action does not involve the comparison of a shoe print with the shoe suspected of making the print. Rather, here the identification is essentially made by comparing shoe wear patterns from different pairs of shoes on the theory that wear patterns are unique and can be used to identify the shoe wearer."
Id. 122 Ill.Dec. at 271, 526 N.E.2d at 530 (emphasis in original). With regard to the cases of United States v. Ferri, supra; People v. Knights, supra; State v. Bullard, supra; andState v. Maccia, supra, the Ferguson court noted:
 "While each of these cases adopt Robbins' theory that a person's foot impression is unique, they do not involve her theory that shoe wear patterns are unique, nor do they involve an identification from shoe wear patterns on shoes that did not make the impressions left at the crime scene."
Id. 122 Ill.Dec. at 273, 526 N.E.2d at 532 (emphasis in original).
In this regard, we note that the case of State v. Mark,286 N.W.2d 396 (Iowa 1979), also did not involve the comparison of shoeprints with the shoe suspected of making those prints. There, a number of prints from tennis shoes were discovered at the scene of the crime. Dr. William W. Gronen, a doctor of podiatry, examined the shoeprints and subsequently examined the defendant "by observing his gait." 286 N.W.2d at 408. Dr. Terry K. Lichty, a podiatrist, conducted a biomechanical examination *Page 652 
of the defendant. On appeal, the defendant claimed that the admission of their testimony "was improper because both podiatrists lacked the requisite skill, knowledge, or experience to render them qualified to express an expert opinion." Id. Finding that the defendant had failed to preserve this issue for review by proper objection at trial, the court remarked: "We do not intimate we would find merit in defendant's challenges to the qualifications of these witnesses even if error had been preserved." Id. at 409. In the case under review, the trial judge noted that in the Mark case, "both Doctor Gronen and Doctor Lichty made observation and studies of the subject prior to the time they were allowed to give those opinions." We distinguish Mark from this case because the experts in Mark testified to a comparison between a trail or series of shoeprints found at the scene of the crime with the particular manner in which the defendant walked based upon observation and examination of the defendant.
We also distinguish the case of Thiel v. State, supra. There, F.B.I. Agent William Bodziak testified as an expert on "forensic foot morphology." 762 P.2d at 484-85. In the traditional manner, he compared and matched shoeprints found at the scene of the crime with running shoes found near the defendant's place of employment. However, he also concluded that the shoes had been worn by the defendant or someone with identical foot morphology based upon his examination of the wear patterns on the insoles of the shoes and their comparison with X-rays and impressions of the defendant's feet. The court observed:
 "Our review of the record, however, convinces us that Thiel's argument [that forensic foot morphology is an unproven field of expertise] is mistaken. Unlike voice print analysis, forensic foot morphology, as described by Bodziak, involves no novel scientific theory or technique. The techniques employed by Bodziak consisted of simple physical comparison between prominent features of Thiel's feet and wear patterns on the insoles of the discarded running shoes.
 "Although the comparison of insole wear patterns and foot morphology may be a relatively rare field of expertise, the underlying technique of physical comparison is neither novel nor unaccepted. Evidence of comparisons similar to those made by Bodziak in the present case has been uniformly accepted, where proffered. [Citing Ferri, supra; Knights, supra; Bullard, supra; and Hasan, supra.]
 "Thiel's argument might be more persuasive if, as Thiel contends, Bodziak had expressed the opinion that no one other than Thiel could have caused the wear pattern found in the discarded running shoes. That opinion would necessarily have assumed that foot morphology, like fingerprints, is unique to the individual. This assumption is arguable a scientific theory that has not been generally accepted.
 "Contrary to Thiel's claims, however, Bodziak did not express such an opinion. Rather, he testified that the running shoes had been worn by Thiel or by someone with foot morphology identical to Thiel's.
 "The jury heard descriptions of the physical comparisons upon which Bodziak based his conclusions. The running shoes and the exhibits relied on by Bodziak for his physical comparisons were admitted into evidence and were available to the jury during its deliberations. It was left for the jury to determine the weight and credibility to give to Bodziak's testimony and the likelihood that other individuals with feet similar to Thiel's might have worn the running shoes."
Thiel, 762 P.2d at 485.
Unlike Thiel, the comparison in the present case does not involve a comparison of shoes with the feet of the accused, but involves a comparison of shoes which did not make the shoeprints found at the scene of the crime with photographs of the shoeprints at the scene. A similar distinction can be made to the case of People v. Daniels, 172 Cal.Rptr. at 359, wherein a county criminologist compared the insole of a tennis shoe which the assailant had dropped at *Page 653 
the victim's residence, "an innersole from a shoe worn by [the defendant] after his arrest, [and] an inked impression of the defendant's bare foot." She testified that there was a "good probability" that the defendant's foot had made the impressions inside the shoe recovered from the scene of the crime.Id. In affirming the admissibility of her testimony, the appellate court observed:
 "We wish to make clear that we are not endorsing
foot or shoe impression comparison as a scientific method of certain identification, comparable, for instance, to fingerprints. The record here does not support a conclusion that foot impressions are unique to individuals."
Id. at 360, n. 5 (emphasis in original).
Except for the cases of Ferguson, supra, and Mark, supra, we have found no reported case involving the attempted identification of a shoeprint found at the scene of the crime based upon a comparison with shoes belonging to the suspect which were not suspected of making, and did not make, the shoe impressions found at the scene of the crime. As noted, we consider Mark factually distinguishable based upon the nature of the particular comparisons involved in that case.
Applying the reasoning of Ferguson to the facts of this case, Dr. Miller's testimony was properly suppressed because his theory of comparison had not gained general acceptance in the scientific community under the Frye standard of admissibility. However, as discussed earlier, in Alabama it appears that under the authority of Ex parte Dolvin, supra, the Frye standard of admissibility does not apply to the comparison involved in this case. Therefore, we find that the trial judge erred in ruling that Dr. Miller's theory of shoeprint identification had to satisfy the "general acceptance" test of Frye. Despite this, we find that the basis of the trial judge's decision to suppress Dr. Miller's testimony is sound.
Maslankowski v. Beam, 288 Ala. 254, 259 So.2d 804 (1972), involved the opinion of an accident reconstruction consultant as to the speed of an automobile immediately prior to the collision. The Alabama Supreme Court indicated that before an expert is permitted to testify it must "[appear] that there was a sufficient quantum of scientific data available upon which a reasonably accurate opinion as to" the subject of the expert's testimony "could be formulated." 288 Ala. at 264-65,259 So.2d at 813-14. Where no explanation of the scientific methods employed are presented to the trial court or where a sparcity of scientific information is presented, an appellate court will be inclined to uphold the ruling of the trial court.288 Ala. at 265, 259 So.2d at 814.
 "With recent technological developments in the fields of medicine, engineering, physics and mathematics we are now living in a world which has become increasingly more complex. It is important that our court system utilize sound technological advancements in judicial proceedings to bring evidence of greater certainty and exactness before the jury.
". . . .
 ". . . [A]s in every . . . case where expert testimony is presented, the responsibility is on the trial court to satisfy itself of the requirements of the law regarding admissibility. If this responsibility is exercised with care so that reasonable expert testimony is presented based upon reasonably sound scientific approaches, then this Court will not reverse in the absence of an abuse of discretion."
288 Ala. at 265, 259 So.2d at 814, 818.
Our review convinces this Court that the trial court did not err in the suppression of Dr. Miller's testimony because the defense failed to lay a proper predicate for his testimony by showing that his method of comparison and identification was based upon reasonably sound scientific approaches. In other words, the defense failed to prove the probative value of Dr. Miller's testimony. See McCormick at 541-42 (irrelevant for want of probative value). " 'The question of the competency of a particular witness to testify as an expert is addressed primarily to the trial court. In the absence of abuse of discretion vested in the trial court, we cannot *Page 654 
supplant its judgment by our own, even if it were otherwise.'Allen v. State, 472 So.2d 1122, 1126 (Ala.Cr.App. 1985)." Exparte Hill, 553 So.2d 1138, 1138 (Ala. 1989). "Whether or not a particular witness will be allowed to testify as an expert is in the sound discretion of the trial court, whose decision will not be disturbed on appeal except for palpable abuse."Burroughs Corp. v. Hall Affiliates, Inc., 423 So.2d 1348, 1353
(Ala. 1982). In this case, we find no such abuse.
 III
The defendant maintains that the State's failure to provide him with information concerning Dr. Robbins' identity and her studies deprived him of due process of law and a fair trial.
Because the transcript of the proceeding in the trial court is lengthy and sometimes confusing, we set forth the material facts in chronological order. It appears that, in most respects, even before consolidation was ordered, the cases against Bird and Warner were treated as joined. In an effort to present as clear a picture as possible, we have examined the records of both Bird and Warner.
 August 18, 1986: In a pretrial order the trial court ordered the parties in the cases involving both Bird and Warner to comply with the rules of discovery set out in Rule 18, A.R.Cr.P.Temp. on or before January 28, 1987.
 August 19, 1986: Warner filed a "demand for discovery and inspection of evidence."
 August 20, 1986: Warner's motion was denied "because the court has entered a pretrial order which adequately covers the discovery requests."
 October 7, 1986: Bird filed a motion for discovery seeking, among other items, the results or report of any "scientific tests or experiments made in connection with or material to the particular case, that are in the possession, custody, control or knowledge of the district attorney." This portion of the motion was formally granted on June 15, 1987.
 February 3, 1987: Warner filed a motion to suppress the shoes seized from both defendants on October 17, 1986.
 February 5, 1987: Warner filed a motion to compel discovery.
 February 9, 1987: At a hearing on the motion to compel, Warner's defense counsel stated that he "understood" that scientific evidence "may very well be that the footprint in there does not relate to either Mr. Bird or Mr. Warner." The prosecutor stated that there "are no results from that specifically," but was "sure we will get some in very soon." February 10, 1987: The trial court ordered that "on or before the close of business on February 13, 1987, the State of Alabama shall have fully complied with this Court's pretrial order dated August 18, 1986."
 February 18, 1987: Warner filed a motion for sanctions for the State's failure to disclose.
 February 20, 1987: At the hearing on Warner's motion to suppress and motion for sanctions, the prosecutor represented that "the State has no intention of offering these shoes into evidence during the trial."
 Warner's counsel stated that "it's my understanding that the evidence gathered is going to be very highly exculpatory. The reports have not been — that's verbal representations from the D.A., that these reports are going to be exculpatory."
 The prosecutor, as directed by the trial judge, disclosed the name and address of their expert, Dr. Robbins. Warner's counsel requested permission for funds to take a video deposition of Dr. Robbins. The trial judge instructed the prosecutor to provide the defendants a copy of Dr. Robbins' report "immediately upon receipt." He told defense counsel to telephone Dr. Robbins to see whether or not a deposition would be necessary. The prosecutor represented that "we are expecting it [the report] today or any day." The State also represented to the court that any scientific evidence they had had been made available to the defendant. *Page 655 
March 2, 1987: At a pretrial hearing, Warner's counsel informed the trial court that he still had not received any written report from Dr. Robbins, that she is "still in the hospital" and that "she will be unavailable for trial and unavailable for deposition prior to trial." Defense counsel argued: "If the State had relayed her identity to us prior to the compelling motion and the motion for sanctions, we would have at least had the opportunity to take this witness's deposition and/or preserve her testimony." From Warner's defense counsel's comments it appears that he had contacted the University of North Carolina, Department of Anthropology, and had been informed that Dr. Robbins' report would either be favorable to or exclude Warner from the case.
 In response, the prosecutor stated that they had not received a written report from Dr. Robbins and that when they received an oral report it was turned over to Warner's counsel.
 Warner's counsel stated that on February 20th, Dr. Robbins had an operation for a malignant brain tumor. This was the same date the State disclosed her identity.
 August 25, 1987: At a pretrial hearing, the State represented to the trial court that it was not going to introduce any footprint evidence. The prosecutor stated, "We did offer earlier to save expense and time and trouble to stipulate to some effect as to what they would or would not show. But that was not accepted." Warner's defense counsel stated that they were going to introduce the footprints in view of the fact that they would exclude all three suspects. At this hearing, Dr. Miller's name was first mentioned.
 August 28, 1987: At a pretrial hearing, the deputy district attorney represented that her office had not talked with Dr. Robbins and that Robbins "had dealt" with the sheriff's office. The trial judge stated that the State "has responded completely and perfectly on that issue [of alleged nonproduction]." In response to Warner's counsel's allegations of nonproduction, the trial judge stated, "You have made identical motions at least four times in this case of which I am aware. And if you at this point really believe that the State is withholding something from you, then put on whatever evidence you have got. And I will make some kind of ruling. If you don't, I prefer that you file the rest of those motions at your own risk." Defense counsel did not pursue this matter at that time.
 September 8, 1987: Jury selection begins. After jury selection, and immediately before trial, Warner's defense counsel stated that the State had produced copies of Dr. Robbins' notes and a letter from her office dated "May of 1987." The prosecutor replied that "[t]hose are working papers sent to us after Dr. Robbins died. The information we received from her assistant was that she never completed her work, and had not reached a final conclusion that would culminate in a report. Anybody looking at this can see it's not a report. It was practically unintelligible." The trial judge stated that "as early as February of this year, Dr. Robbins was in no condition to do anything. * * * [She] wasn't going to be of any assistance to anybody in this case due to her health."
 While this matter was under discussion, Warner's defense counsel stated that Dr. Robbins "was hidden from us until she became too ill to give deposition testimony." The prosecutor characterized this allegation as "preposterous" and a "total misrepresentation." The trial judge stated, "I don't agree with what you said Mr. Shinbaum [Warner's defense counsel]. I tell you that I have heard it before. I don't know about the notes, but this stuff about hiding witnesses, we have gone through that enough times, we don't need to regurgitate that again."
Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215
(1963), established the principle that a prosecutor has a constitutional duty to disclose evidence favorable to the defendant. In Ex parte Brown, 548 So.2d 993, 995 (Ala. 1989), the Alabama Supreme *Page 656 
Court held that "where defendant has timely requested the production of exculpatory evidence that is material to his defense and the trial judge has ordered that such evidence be produced, Brady, supra, and Rule 18.1, A.R.Crim.P., require that the evidence be produced at a reasonable time before trial."
"In order to establish a Brady violation, the defendant must establish the following elements: 1. that the prosecution suppressed the evidence; 2. that the evidence was of a character favorable to the defense; and 3. that the evidence was material." Ex parte Dickerson, 517 So.2d 628, 630 (Ala. 1987). "[E]xculpatory evidence, regardless of its trustworthiness or admissibility, should be disclosed." Exparte Brown, 548 So.2d at 994. Accord, Ex parte Kimberly,463 So.2d 1109, 1112-13 (Ala. 1984).
As our Supreme Court observed in Ex parte Monk,557 So.2d 832, 837 (Ala. 1989), "[m]any Alabama capital cases have been reversed in state and federal collateral proceedings for Brady
problems." One of the cases cited was from Montgomery County.Ex parte Womack, 541 So.2d 47 (Ala. 1988). See also Ex parteMotley, 534 So.2d 564 (Ala. 1988) (reversal of non-capital case for failure to disclose copy of defendant's statement to law enforcement officer under Rule 18).
Although the record does show that the State appeared reluctant to produce certain evidence,[1] we agree with the trial judge and find no evidence that the prosecution suppressed either the identity of or information obtained from Dr. Robbins.
 IV
Defendant Bird maintains that the principles of Brady v.Maryland, supra, were also violated and error was committed when the State failed to disclose prior to trial the previous statements and grand jury testimony of witness Lillian "Neece" Dudley.
At trial, Ms. Dudley testified to the effect that about the time of the murder she drove her automobile by the victim's store and saw defendant Warner standing in the window. She saw "three or four" people in the store but the others were in the shadows. She also observed Bird's automobile parked beside the store at that time.
Prior to trial, in statements to an investigator for the sheriff's office and in her grand jury testimony, Ms. Dudley had identified Eddie Lee McQueen as the person she saw in the store. The State contended, and the trial judge agreed, that Ms. Dudley's identification of Warner at trial instead of McQueen was a surprise to the State, although the prosecutor, at one point, stated: "She mentioned Warner to me Your Honor, but she also mentioned Mr. McQueen, I thought we had an unclear identification." Defense counsel did not seek an explanation of this statement. From the record, the meaning of the prosecutor's statement is unclear.
After its direct examination of Ms. Dudley, the State presented the trial judge with Ms. Dudley's grand jury testimony and statements she made to the investigator. During the recess in the cross-examination of Ms. Dudley, the trial judge gave defense counsel a portion of her grand jury testimony and a statement she made to the investigator. At that time, the trial judge stated, "[T]hat also falls under the category of exculpatory evidence if it wasn't produced." During the hearing to determine whether or not the evidence was exculpatory, the trial judge stated:
 "I may have misspoke. It's certainly impeachment testimony. * * * Well, the issue kind of boils down to when did this stuff become exculpatory, and from what I have heard today, nobody knew she was going to testify like she did until she testified and it didn't become exculpatory until then. * * * I don't find any misconduct *Page 657 
[by the State]. * * * None of it is exculpatory on behalf of Mr. Byrd[2]."
Defense counsel for both Bird and Warner took the witness stand to establish that they had not received either Ms. Dudley's statements or her grand jury testimony prior to trial. On cross-examination, Warner's defense counsel stated: "I was aware she had been by the crime scene but prior to this time, my information had been that she did not recognize anyone in the store." Counsel admitted that he was aware that the State "has made allegations that more than one person was involved in this crime." Warner's defense counsel interviewed Ms. Dudley on the telephone on February 24, 1987. He testified that he "received no specific response [from her] as to who she saw in the store. She said she saw two, maybe three people. . . . Miss Dudley also said that she did not see Jake Warner at the store at that time." Warner's counsel stated that he was prepared to impeach Ms. Dudley's trial testimony on the basis of that telephone conversation which counsel had tape-recorded.
Warner's defense counsel also admitted that he had subpoenaed Sammie McQueen and had talked with him. Later, counsel stated that McQueen "is listed as a not-found witness. Based on what he had told us today [sic], we were not going to attempt to try [to] find him because we didn't think he had anything to add to this case."
"Exculpatory evidence is 'evidence which extrinsically tends to establish defendant's innocence of the crimes charged as differentiated from that which although favorable, is merely collateral or impeaching.' " Commonwealth v. Jeter,273 Pa. Super. 83, 416 A.2d 1100, 1102 (1979). "Evidence is exculpatory if it tends to disprove a fact in issue which is material to guilt or punishment." State v. Carmichael,240 Kan. 149, 727 P.2d 918, 923 (1986).
 "Brady thus requires disclosure by the government of evidence that is both exculpatory and material. Exculpatory evidence includes material that goes to the heart of the defendant's guilt or innocence as well as that which might well alter the jury's judgment of the credibility of a crucial prosecution witness. Evidence impeaching the testimony of a government witness is exculpatory when the credibility of the witness may be determinative of a criminal defendant's guilt or innocence. If the exculpatory evidence 'creates a reasonable doubt' as to the defendant's culpability, it will be held to be material."
United States v. Starusko, 729 F.2d 256, 260 (3rd Cir. 1984) (citations and footnote omitted).
We find that Ms. Dudley's pretrial identification of McQueen was not exculpatory with regard to either Bird or Warner under the facts of this case. Her pretrial statements became exculpatory because they impeached her testimony at trial. However, as the trial judge found, that occurred only when Ms. Dudley testified differently at trial. Even if we consider Ms. Dudley's pretrial identification of McQueen as exculpatory, we find that it did not create "a reasonable doubt that did not otherwise exist." Ex parte Womack, 541 So.2d at 60. See also Exparte Watkins, 509 So.2d 1064, 1066-67 (Ala. 1984). At trial, defense counsel used the impeaching evidence to its fullest measure. We do not think that the failure to disclose this information at an earlier date affected the fundamental fairness of the trial. See Ex parte Geeslin, 505 So.2d 1246,1247-48 (Ala. 1986), cert. denied, 481 U.S. 1037,107 S.Ct. 1974, 95 L.Ed.2d 814 (1987). "To prevail on this sort of aBrady claim [that the State withheld requested, exculpatory material], the appellants must show that the prosecution either withheld or suppressed favorable evidence that would have created a reasonable doubt otherwise absent." United States v.Willis, 759 F.2d 1486, 1499 (11th Cir.), cert. denied,474 U.S. 849, 106 S.Ct. 144, 88 L.Ed.2d 119 (1985).
 V
Rule 15.4(b), A.R.Cr.P.Temp., provides that "the court shall not order that the defendants be tried together without *Page 658 
first providing the defendants and the prosecutor an opportunity to be heard." That rule was not violated in this case.
The facts bearing on this issue are set forth in chronological order. Counsel for both Bird and Warner were present at each hearing.
 August 27, 1986: The State filed a motion to consolidate the cases against Bird and Warner.
 September 8, 1986: At a pretrial hearing, the trial judge asked defense counsel for Warner if there were any reasons why the cases should not be consolidated. It appears that, at this time, both the State and defendant Warner did not have enough information upon which to argue the motion.
 October 10, 1986: At a pretrial hearing on the motion to consolidate, Bird's defense counsel represented to the trial court that the motion to consolidate was "premature" on both sides. The trial judge continued the motion "pending ya'll's full investigation into the case." February 10, 1987: Bird filed a written objection to consolidation. It does not appear that Warner filed any objection, either oral or written, to the motion to consolidate.
 February 20, 1987: At a pretrial hearing, the motion to consolidate was again discussed.
 March 2, 1987: At a pretrial hearing, the trial judge stated: "I am really prepared — we have never had a hearing on the Motion for Consolidation, have we? * * * I am prepared to do that today if the parties are ready. If not I will set another date to do it any day this week." In response, the prosecutor stated, "Judge, the State's position at this time is it's simply not ready. A continuing investigation is not complete, and we feel very strongly that that could have a serious outcome on whether or not these cases should and will be consolidated. The kink as far as the State goes is simply receiving this report from Dr. Robbins [on the shoeprints]."
 At the conclusion of this hearing the following occurred:
 "THE COURT: I will make up my mind by tomorrow whether or not we are going to try this case on the 16th. And if I don't, then I will set this case for a new trial date and give you a specific date for a consolidation hearing. Do ya'll want it consolidated?
 "MR. DUFFEY [Defense Counsel for defendant Bird]: No, sir. We object to consolidation.
 "THE COURT: Ya'll don't really know whether you do or not.
 "MS. BROOKS [Chief Deputy District Attorney]: At this point we do, Your Honor, but that is subject to change, if you will forgive me.
 "THE COURT: That's all right. I might consolidate it over everybody's objection, who knows."
 June 15, 1987: The trial judge issued an order granting the motion to consolidate and setting the trial for September 8, 1987.
In Sharpe v. State, 560 So.2d 1107, 1111 (Ala.Cr.App. 1989), this Court held:
 "We find that Rule 15.4(b) does not require either an adversarial hearing or oral argument. Under that rule, a party has been given 'an opportunity to be heard' when the party has responded in writing to the merits of the motion to consolidate. We consider the phrase 'opportunity to be heard' as synonymous with the phrase 'opportunity to object,' which, of necessity, requires notice that the consolidation has been requested."
It is clear that in this case all the parties were given several opportunities to orally argue the motion and had the opportunity to object on any number of occasions. There was no error in consolidating the cases against Bird and Warner without an adversarial hearing.
 VI
Bird maintains that his motion for a mistrial should have been granted because of the prosecutor's violation ofBruton v. United States, 391 U.S. 123, 88 S.Ct. 1620,20 L.Ed.2d 476 (1968), when he used the term "white guy" in his examination of witness Houston Gray. Under the facts of *Page 659 
this case, that term could be reasonably understood as referring only to Bird.
Bruton held that "the admission of a nontestifying defendant's statement in a joint trial, implicating a co-defendant, violated the Confrontation Clause." United Statesv. Pendegraph, 791 F.2d 1462, 1465 (11th Cir.), cert. denied,479 U.S. 869, 107 S.Ct. 235, 93 L.Ed.2d 160 (1986). "However, if otherwise admissible, the statement may be admitted if all references to the codefendant are deleted. . . . The introduction of a redacted confession may still violate theBruton rule if the statement compels a directly inculpating inference." Id. ("In light of the other evidence presented by the Government, . . . the jury could very easily infer Pendegraph to be the 'individual' referred to in Mickel's confession, if only because there was no other possibility.") "[T]he Confrontation Clause is not violated by the admission of a nontestifying codefendant's confession with a proper limiting instruction when, . . . the confession is redacted to eliminate not only the defendant's name, but any reference to her existence." Richardson v. Marsh, 481 U.S. 200, 211,107 S.Ct. 1702, 1709, 95 L.Ed.2d 176 (1987) (quoted in United States v.Petit, 841 F.2d 1546, 1556 (11th Cir.), cert. denied,487 U.S. 1237, 108 S.Ct. 2906, 101 L.Ed.2d 938 (1988) ("In this case Pasqual's statement that he called a 'friend' who gave permission for the goods to be stored at his warehouse, when considered with the other evidence, could reasonably be understood only as referring to Petit.").
Before State's witness Houston Gray testified before the jury, both defendants made a motion in limine seeking to prohibit the prosecution from "elicit[ing] identifying information of any type about the other person Jacob Warner said he was with." Gray was then questioned outside the presence of the jury. At this time, Gray testified that, while he and Warner were confined in the Montgomery County jail, Warner told him that "they said" that Warner committed the robbery and murder. The prosecutor stated that she was surprised by this testimony because Gray had testified before the grand jury that Warner told him that "he" had committed the offense. Before Gray testified before the jury, the trial judge carefully instructed him that he could testify only to what Warner told him that Warner did and that he could not testify to anything that Warner and Bird did.
Before the jury, Gray testified that Warner told him that "they said" that he committed the murder and robbery, and that Warner did not state who "they" were. The prosecutor then questioned Gray about his testimony before the grand jury, paraphrasing the questions so as to omit any reference to Bird. However, Warner's defense counsel objected and requested the trial judge to instruct the prosecutor to state the "whole question in its entirety, the way it was, the way it was asked" instead of "paraphrasing it."
Only after the objection did the prosecutor ask Gray if he testified before the grand jury that Warner told him that Warner and "some black guy and a white guy beat up some old white man with a pool stick and killed him." Only after the prosecutor had used the term "white guy" on four occasions in referring to one of Warner's accomplices in his direct examination of Gray did Bird's defense counsel object to the use of the term "white boy."
 "BY MR. DUFFEY [Bird's Defense Counsel]: Your Honor we would also object that Mr. Maddox [assistant district attorney] has gone too far in his examination about what other people participated in, I think, when he refers to a white boy.
 "BY THE COURT: Well, I haven't, — I had him restricted a while ago, then Mr. Abell [Warner's associate defense counsel] made him read the whole question.
 "BY MR. DUFFEY: I understand, but I could not object without —
 "BY THE COURT: That's fine. Don't put Bird in that, you are going to have to paraphrase the questions from the grand jury testimony so that Bird is left out of them."
In the remainder of the somewhat lengthy direct examination of Gray, the prosecutor *Page 660 
made one reference to "white boy" in questioning Gray about his grand jury testimony. There was no objection by defense counsel for either defendant. We note that throughout his testimony Gray never used the term "white boy" or "white guy."
After Gray testified, a witness for the defense testified out of turn by agreement. After his testimony, the trial judge stated: "Ladies and gentlemen, I intended to tell you after the first time that Mr. Gray testified, that Mr. Gray's testimony in the case is only admissible against Mr. Warner and not against Mr. Byrd."
Four other witnesses testified before the State rested its case-in-chief. Only after the State had rested and after Bird's defense counsel had moved for a judgment of acquittal was there any request for a mistrial. At that time, Bird's defense counsel requested a mistrial because of the prosecutor's references to "white boy" and because the evidence will tend to identify Bird "as being the [white] person who was with these black defendants [sic] on that night." This motion was denied.
"To be timely, an objection must be interposed as soon as the ground for the objection becomes apparent." Watson v. State,439 So.2d 762, 769 (Ala.Cr.App. 1983). "An objection to evidence must be made when the evidence is offered." Walker v.State, 265 Ala. 233, 236, 90 So.2d 221, 224 (1956). "[O]bjection to a question must be made as soon as a question is stated, unless its inadmissibility is due not to the subject of the question but something contained in the answer."Willingham v. State, 261 Ala. 454, 458, 74 So.2d 241, 244
(1954). See also Ex parte Marek, 556 So.2d 375 (Ala. 1989) ("[W]hen a litigant makes a motion for a mistrial immediately after the question or questions are asked that are the grounds made the basis of the motion for the mistrial, and the grounds for the motion are clear and definite, then the motion for mistrial will preserve for review lesser prayers for relief, such as an objection or motion to strike.").
The defendants' motion in limine was not sufficient to preserve the alleged error for review because there was no subsequent timely objection. See Phillips v. State,527 So.2d 154 (Ala. 1988). "A violation of the exclusionary ruling granting a motion in limine does not always or automatically result in ineradicable prejudice to the accused and error requiring a mistrial." Richardson v. State, 439 So.2d 756, 757
(Ala.Cr.App. 1983). "This Court has held that a trial judge is allowed the exercise of broad discretion in deciding whether the high degree of necessity required for a mistrial is present." Ex parte McCall, 541 So.2d 1075, 1076 (Ala. 1989). We find that the trial judge properly denied the requested mistrial.
 VII
Bird maintains that the evidence is insufficient to support his convictions. We disagree. Applying the principles and standards for appellate review of the sufficiency of the evidence in a case involving circumstantial evidence set out inDolvin v. State, 391 So.2d 133 (Ala. 1980); Cumbo v. State,368 So.2d 871 (Ala.Cr.App. 1978), cert. denied, 368 So.2d 877
(Ala.Cr.App. 1979); and White v. State, 546 So.2d 1014
(Ala.Cr.App. 1989), we find that the evidence is sufficient. As stated in Ex parte Cunningham, 548 So.2d 1049, 1050 (Ala. 1989):
 "This Court must review the evidence presented by the state in its most favorable light when deciding the sufficiency of the evidence. Walker v. State, 416 So.2d 1083 (Ala.Crim.App. 1982). A verdict of conviction will not be set aside on an assertion of insufficiency of the evidence unless, considering all reasonable presumptions of correctness, the preponderance of the evidence against the verdict is so decided as to clearly convince the Court that it was wrong and unjust. Johnson v. State, 378 So.2d 1164
(Ala.Crim.App.), cert. quashed, 378 So.2d 1173 (Ala. 1979). The test applied in this situation is whether the jury might reasonably find that the evidence excluded every reasonable hypothesis but guilt. See Dolvin v. State, 391 So.2d 133 (Ala. 1980)." *Page 661 
In this case, the trial judge entered written findings of facts summarizing the crime and the defendants' participation. See Ala. Code 1975, § 13A-5-47(d). Those findings are supported by the record and appear as follows:
 "The State proceeded on the theory that the capital murder of Williams was committed by three individuals: Byrd, Warner, and, most likely, Lee Lewis (Lewis). Lewis has not been indicted for the offense.
 "Williams operated what can best be described as a store and nightclub in south Montgomery County, Alabama. Williams also lived in a room in the rear of the club. He was last seen alive when he closed the store on October 13, 1985, between 1:30-2:00 a.m. Willie Ed June worked for Williams. When he arrived at the store the following morning to clean up he could not get Williams to come to the door; and he called the sheriff's office. Deputy Sheriff Watson found Williams' body in the nightclub area of the building. A shattered and bloody pool cue was found in the vicinity of the body, and a cigar box in which Williams kept money was missing.
 " 'Neece' Dudley passed by Williams' store at approximately 4:00 a.m. the same morning. She saw a car parked by the store which she subsequently identified as a car owned by Byrd. As she pass the store, she looked at the front window and saw the silhouette of a male whom she identified, for the first time at the trial, as Warner. On October 22, 1985, a search of Byrd's car trunk yielded a cigar box which was identified as a change box from Williams' store. On the morning of the offense, Stanley Osborne saw Byrd's car and it did not have carpet in the front. It can be inferred from this, and from the fact that bloody footprints were left at the scene of the crime, that Byrd [had] removed the carpet because it was bloody and was evidence connecting him with the crime.
 "Dr. Sapala testified that the cause of Williams' death was multiple trauma and stab wounds to both lungs. The reasonable conclusion from Dr. Sapala's testimony is that Williams was beaten and then stabbed with the pool cue.
 "Byrd and Warner were incarcerated in the Montgomery County Jail, and in the penitentiary, for the commission of other offenses before they were indicted for Williams' murder. Byrd told other inmates in the Montgomery County Jail and at the penitentiary (David LaRue) about killing Williams because Williams was going to testify against Byrd in a pending criminal case, and Williams could identify him and Lewis. He specifically told Charles Johnson that they got a little money in a cigar box. Warner told jail inmate Buddy Nichols that he and others killed Williams. All of the 'jailhouse' confessions were introduced at trial.
 "Prior to Williams' death, Williams reported to sheriff's investigators that Byrd had stolen money from his store. Upon being confronted with the complaint, Byrd confessed to the offense [of theft], and after Williams' death, Byrd pled to a youthful offender adjudication."
During the trial, the judge responded to the contention of Warner's defense counsel that the State had presented no evidence of robbery:
 "BY THE COURT: Well, there is evidence in this case that the victim's pocket was inside out, which is not how people usually wear [their] pants. There is evidence in this case that two days after the offense took place, that your man, Mr. Byrd in this case, had a large amount of money on him. There is evidence in this case from a witness whose testimony has been impeached on several points, but at any rate it's evidence at this point, she saw Jacob Warner in the store that night, and that there was a car parked out front which was Mr. Byrd's car. * * * And there was evidence from at least one witness, if the jury wants to believe it or not, that he saw Mr. Byrd that got a cigar box out of the trunk of his car."
Based upon those findings and our review of the evidence, we find that the motion *Page 662 
for judgment of acquittal as to each defendant was properly denied.
 VIII
Bird maintains that "Lillian Dudley's testimony should have been excluded because of incredible inconsistencies in her testimony [at trial] and admitted perjured testimony [before the grand jury]." Appellant's brief at 91. Bird also argues that it is apparent that Ms. Dudley's testimony is based upon facts which she could not have observed. That particular argument is not supported by facts in the record as there is no evidence that it was physically impossible for the witness to have seen Warner in the window of the store on the night of, and apparently during, the commission of the crime.
Ms. Dudley did mention that she first decided she could identify Warner when she saw him in the Cleveland Avenue Grill one night after she had testified before the grand jury. Ms. Dudley testified before the grand jury on May 8, 1986. There is other testimony in the record that Warner was transferred from the Montgomery County jail to the Alabama Department of Corrections on April 18, 1986. Information in the presentence report states that Warner had been incarcerated since March 21, 1986, when he was sentenced to 15 years' imprisonment for receiving stolen property. The trial judge instructed the jury to disregard "all this stuff about going to the cafe, and seeing Mr. Warner."
Subsequent to this exclusion, the trial judge questioned Ms. Dudley about her testimony. Ms. Dudley then stated that she did see Warner at the cafe "after the death" and not after her grand jury testimony. Therefore, a consideration of all the evidence shows that Ms. Dudley's testimony was not based upon a physical impossibility.
The rule is that "the witness must have had an opportunity to observe the facts to which he testifies and have actually observed them." C. Gamble, McElroy's Alabama Evidence § 105.01 (3d ed. 1977). However, the fact that a witness has given inconsistent statements or accounts about an event or occurrence is not a ground for the exclusion of the witness's testimony.
 "If a witness testifies on direct examination that he saw a certain thing occur, and then on cross-examination testifies that he did not see such occurrence, the testimony on cross-examination is not a ground for exclusion of the testimony given on direct examination. The statement given on cross-examination is considered an inconsistent statement and only goes to the credibility of the witness in the eyes of the jury."
Id. "Inconsistencies and contradictions in the testimony of a witness do not make it inherently improbable." Arnold v. State,33 Ala. App. 146, 147, 30 So.2d 587, 588 (1947) (quoted in Jonesv. State, 469 So.2d 713, 717 (Ala.Cr.App. 1985)). In UnitedStates v. Rivera, 775 F.2d 1559 (11th Cir. 1985), cert. denied,475 U.S. 1051, 106 S.Ct. 1275, 89 L.Ed.2d 582 (1986), the appellant presented an argument similar to that presented here.
 "There can be no doubt that [witness] Weiss was a drug dealer and an outlaw. He had been involved in several drug trafficking schemes. He entered into a plea agreement with the government on the present charges. The charge that Weiss perjured himself or that the defense evidence undermined Weiss' testimony, while bearing on Weiss' credibility are not factors in determining incredibility as a matter of law and were certainly matters wholly within the province of the jury. For testimony of a government witness to be incredible as a matter of law, it must be 'unbelievable on its face.' United States v. Cravero, 530 F.2d 666, 670 (5th Cir. 1976). Further, 'the fact that [the witness] has consistently lied in the past, engaged in various criminal activities, thought that his testimony would benefit him, and showed elements of mental instability does not make his testimony incredible.' Id. In United States v. Garner, 581 F.2d 481 (5th Cir. 1978), the court underlined the stringent rule that 'for the testimony to be considered incredible, "it must be unbelievable on its *Page 663 
face", i.e., testimony as to "facts that [the witness] physically could not have possibly observed or events that could not have occurred under the laws of nature." ' Id. at 485. (quoting Cravero, 530 F.2d at 670).
 "Under this test, Weiss' testimony was not incredible as a matter of law. A judgment of acquittal 'is not required because the government's case includes testimony by "an array of scoundrels, liars and brigands." ' United States v. Hewitt, 663 F.2d 1381, 1385 (11th Cir. 1981), quoting United States v. Tiche, 424 F. Supp. 996, 1000-01 (W.D.Pa.), aff'd mem., 564 F.2d 90 (3rd Cir. 1977). The jury's decision as to the credibility of Weiss will not be disturbed on appeal. United States v. Palacios, 612 F.2d 972, 973 (5th Cir. 1980); United States v. Hewitt, 663 F.2d at 1386.
". . . .
 "In the face of extensive impeachment of Weiss on cross examination concerning Weiss' bad acts and bad character the jury chose to believe him. There the matter ends."
Rivera, 775 F.2d at 1561-62.
"[W]here there is an opportunity to observe, though slight, a witness may testify as to what he observed, and the circumstances attending his observation merely go to the weight of the evidence, which is, of course, for the jury."Britton v. Doehring, 286 Ala. 498, 503, 242 So.2d 666, 670
(1970). "It has been pointed out, however, that for the doctrine of physical impossibility to be applicable to the testimony of a witness, that testimony must be such that a reasonable mind must reject it as wholly impossible of belief in view of the physical evidence; mere improbability is not impossibility in terms of the doctrine under discussion." 5 Am.Jur.2d Appeal and Error § 827 (1962) (footnotes omitted). "The credibility of a witness [even though impeached] is a question for the jury." Cason v. State, 515 So.2d 719, 720
(Ala. 1987).
 IX
The State was properly allowed to attempt to rehabilitate witness Lillian Dudley. At trial, Ms. Dudley was impeached as a witness. Before the grand jury and on two occasions in statements to an investigating officer, she identified Sammy McQueen as the individual she observed on the night of the crime. At trial, apparently for the first time, she identified Warner as that person. Outside of the presence of the jury and after Dudley had been cross-examined, the trial judge stated, "They [the prosecution] are entitled to rehabilitate the witness and the court will find the witness has been successfully impeached on cross-examination in this case. There is no doubt about that."
On redirect examination and over the objection of Warner's defense counsel, Ms. Dudley was permitted to state why she lied on the previous occasions when she identified McQueen. Our review of the record shows that Bird's defense counsel posed objection to the rehabilitation of this witness only after the State had elicited her rehabilitating testimony.
Ms. Dudley testified that one reason she lied was because "people was saying that them boys [the Warner brothers] was bad." After that answer, the trial judge instructed the jury as follows:
 "BY THE COURT: All right, let me stop you right there. We are dealing with something which I would refer to as Ms. Dudley's state of mind as to why she did something, what prompted her to do something. What she's saying is that somebody told her something that prompted her to do it. I am admitting that testimony only as a reason she's offering that to you. I'm not admitting that testimony for you to arrive at a conclusion that 'those boys are bad.' Whether or not that's true is not the issue. The only issue is why Mrs. Dudley says she did not testify truthfully. Do ya'll understand that?
"BY THE JURY: Yes, sir.
 "BY THE COURT: You are not to take 'those boys are bad' as the truth of that statement at all, but only as her reason for showing why she did, and then you have to attach whatever weight you want to that." *Page 664 
Ms. Dudley testified that she was afraid of the Warners. She testified that she decided to tell the truth after her ten-year-old son urged her to tell the police what she saw because, as Ms. Dudley testified, the child stated, "he [the victim] was a good man, we used to go in there, and he would give the children free candy, stuff like that." Ms. Dudley stated: "I figured if a little child come and tell you something like that, tell you to come out and tell something like that, a ten year old child, then I might as well as go ahead, I won't be afraid any more."
"Where a witness admits on cross-examination that he has made a statement or done an act which is contradictory of or discrediting to his testimony, he may testify on redirect examination as to his motive or reason for making the statement or doing the act." McElroy's at § 102.07(2)(d) citing Stephensv. State, 252 Ala. 183, 185, 40 So.2d 90, 91 (1949) ("It was not error to permit this witness on re-direct examination to testify that on the former trial he understood that he was asked as to whether his father (the deceased) [rather than the defendant] had a knife"). "It is a well established rule of law, that where a witness has been cross-examined respecting his former statements with a view of impairing his credit, the counsel who called him has the right to re-examine him, so as to afford him an opportunity of explaining such statements, (2 Russell on Cr. 937;) and it is also said by the same authority, that he may be asked what induced him to give to the person or persons to whom he made the communication the account which he has stated in the cross-examination. — ib. 937; 2 Brod. 
Bing. 297." Campbell v. State, 23 Ala. 44, 76 (1853). This rule was fully covered in Pollard v. Rogers, 234 Ala. 92, 99-100,173 So. 881, 886-87 (1937):
 "The exception [to the general rule of evidence] allows a witness, who on cross-examination admits making, or is shown to have made, a prior statement inconsistent with that testified on direct examination, to give his own undisclosed intent, motive, or other mental state, as an explanation for having made the prior inconsistent statement. . . .
". . . .
 "It is well settled that the general rule would ordinarily render incompetent the statement of a witness giving his uncommunicated motive or reason for the given act, subject, however, to the well-recognized exception thereto, that when a witness has admitted on cross-examination the use of certain expressions or statements tending to discredit his testimony, he may on redirect examination in response to proper questions state what induced him to make such expressions or statements, although it is but an uncommunicated motive."
(Emphasis in original.)
For the reasons set out in this opinion, the judgment of the circuit court is affirmed.
AFFIRMED.
All Judges concur.
[1] At one point during the proceedings for discovery, the trial judge directed the prosecutor to disclose information with regard to certain statements and remarked, "I don't really understand why this is like pulling teeth." The assistant district attorney replied, "I am working under instructions, Your Honor."
[2] At various places in the record the defendant's name is spelled "Byrd."